UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**,  :

                                                      :       CASE NO. 11-CR-20587

v.                                                     :

                                                      :

**RAFAEL ALALU**,                             :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .:

## RAFAEL ALALU'S SENTENCING MEMORANDUM

The initial PSR calculated a total offense level of 33. Defendant submitted his objections to the Probation Department, which are reflected in the addendum to the PSR released to counsel on December 5, 2012. The revised PSR again computed a total offense level of 33 as follows:

**Base Offense Level**:                                                                          **6**

**Specific Offense Characteristics**: The defendant is said to be accountable for a loss of $14,533,000, resulting in an increase of 20 levels. § 2B1.1(b)(1)(K).          **+20**

**Sophisticated Means:** Because the offense allegedly involved sophisticated means, the offense level is increased by two levels. § 2B1.1(b)(10)(C).          **+2**

**Adjustment for Role in the Offense:** The PSR suggests that Mr. Alalu was a manager or supervisor (but not an organizer) and that the criminal activity involved five or more participants or was otherwise extensive. § 3B1.1 (b).          **+3**

**Adjustment for Obstruction of Justice:** The government claims that Mr. Alalu willfully obstructed or impeded the administration of justice based on his trial testimony. § 3C1.1          **+2**

**Total Offense Level:**                                                                         **33**

The defense objects and proposes instead that Mr. Alalu's total offense level be computed as follows:

**Base Offense Level**: **6**

**Specific Offense Characteristics**: The only "reliable and specific evidence" concerning the amount of the actual or intended loss consists of the testimony of FBI Agent James McGinty, who testified that there was only a single patient of Mr. Alalu, C.S., who did not receive the service that Medicare was billed for. *See* Transcript of August 13, 2012 [DE # 987] at 204 (McGinty testimony). The total amount of loss based on this one submission was $168.55. *See* Gov. Ex. 3-A, resulting in no increase to the total offense level, §2B1.1(b)(1)(A). In the alternative, if this Court chooses to use gain to the defendant as an alternative measure of loss, that would result in a increase to the base offense level of 8, based on his compensation while employed at BMI, approximately $80,000. § 2B1.1(b)(1)(E). **+8**

**Adjustment for Role in the Offense:** Because Mr. Alalu was a minor participant in the conspiracy, the offense level should be decreased by two levels, § 3b1.2, consistent with another therapist, Thomas Hamer. **-2**

**Total Offense Levels (Maximum):** **12**

A Level 12 corresponds with a guideline range of 10-16 months. Because it is within a Zone C, Mr. Alalu would be eligible for probation. We submit that a Zone C sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. *See* 18 U.S.C. §3553 (a).

## I. Overview

The jury convicted Mr. Alalu of one count of conspiracy (Count 1) and two counts of health care fraud (Counts 3 & 4). The jury acquitted Mr. Alalu of another count of health care fraud (Count 11). Having presided over the trial, this Court had the opportunity to hear about the charged *offenses*. Although Mr. Alalu testified, the Court still did not learn much about him on a personal level.

As Mr. Alalu's trial counsel touched upon in his summation, Mr. Alalu provided real therapy for the patients of Biscayne Milieau ("BMI") and did not seek to obtain any

extraordinary benefit from his work there.  He earned the same salary regardless of whether

his employer, BMI, floundered or flourished:

> Another quote was by the Government, by Mr. Davis himself in his opening
> statement: "The object of any fraud scheme is to make money." Well put. Mr.
> Alalu, Dr. Alalu, Rafael, Ralph, whatever you want to call him, was on salary.
> When business was good for Biscayne Milieu, he got a salary. When things
> were sparse and there weren't many patients in Biscayne Milieu, he got a
> salary. . . Kickbacks and bribes. No evidence that he did that.  Paying
> kickbacks and bribes to patient recruiters. He had nothing to do with the
> money. He got his salary. Nothing of that. Diverting proceeds of the funds for
> personal use. He didn't divert. He didn't write a check. He just went to work
> and got paid.

Transcript of August 22, 2012 [DE #____] at p. 9 (Lehr Summation).

The absence of greed, enrichment, or any other extraordinary financial reward was an

important component of Mr. Alalu's defense at trial, and it is an even more important

component of his sentencing presentation. The outpouring of letters submitted on Mr. Alalu's

behalf, submitted to the Probation Department, tell the story of a dedicated husband and

father, committed to improving his community and the lives of his patients, and who would

never steal or intentionally cause financial harm to anyone.

Dr. Enrique Gorin, M.D., a physician in Miami who is related to Mr. Alalu through

marriage, described why Mr. Alalu is a respected and admired therapist, and one who is

beloved especially by those less fortunate than he is:

> I can PERSONALLY attest that Dr. Alalu has taken care in multiple occasions
> [sic] several of my patients, as well as my partner's Dr. Enrique Hanabergh.
> He has never asked us for patient insurance status or ability to pay, and in
> every case he has been able to help resolve their psychological issues no matter
> how serious they are.

Another colleague and friend, Dr. Warren Krantz, M.D., FAAP, writes: "I have followed his training with interest because I could not wait to refer my patients to the type of individual who had the compassion, caring, and uncompromised values of Mr. Alalu. He never disappointed this trust I had in referring my most difficult psychological cases."

Mr. Alalu's former patients, such as Dr. M████ D██████, M.D., echo those sentiments: "There are few people in life that have the capacity to turn your life around for the better. He did that for me. I know for a fact that I'm one of many." Another former patient, M███ B█████, agrees: "Ralph even canceled plans with his family on a Saturday evening to help with a crisis. Dr. Alalu has always been there for me and my family, and has helped in so many difficult situations, never looking at the clock or being concerned with payments. His motto is, 'I am here to help you. . . .'"

Mr. Alalu also has the support of the community at large. Rabbi Daniel Bitton observed that Mr. Alalu "did a vast number of good deeds towards widows, orphans and the elderly, and stretched his arm to those in need not expecting anything in return, with a humble heart that could not see the suffering of others without acting upon it. He is an extraordinary individual." Rabbi Mordechai Salfer, PhD, the Director of a specialized Jewish high school in Miami for students with learning and physical challenges, summarizes the impact that Mr. Alalu had on his community:

> We had a boy who came from a very poor home in Upstate New York. He had brain cancer and many surgeries. He was a sweet, nice boy, who had many challenges. His mother developed cancer while he was away here and he reacted to the news by becoming increasingly depressed. Today the boy's mother is better; the boy has moved on to a solid job; and he is going to college. Ralph put aside everything on his plate and met with this boy again

and again. His door was open always. The boy could call and ask to meet, and Ralph would get him in. There was never talk of payment. Never once was there even an ask. There has never been any talk of compensation from Ralph over the last four years of meeting with all of these boys he has helped move on in life to a successful future. There has been care. Where do you find such care? Not very often.

This is a very small sample of the over 90 letters from friends, family, neighbors, and colleagues in support of Mr. Alalu. All describe Mr. Alalu as a humble, virtuous man from a religious family. He is devoted to helping others. He regularly attends religious services at his temple, and he is a charitable person who puts others ahead of himself.

We therefore urge the Court to balance the calculation under the Guidelines by considering Mr. Alalu's many characterisitics that weigh heavily in favor of a merciful sentence in this case.

## II.    The Guidelines Calculation

Mr. Alalu objects to four adjustments: Specific Offense Characteristics – "Loss" [PSR ¶150]; Sophisticated Means [PSR ¶151]; Adjustment for Role in the Offense [PSR ¶153]; and Obstruction of Justice [PSR ¶154]. In all events, Mr. Alalu proposes that the court depart downward to Zone C.

### PSR ¶150:  Specific Offense Characteristics – "Loss"

The PSR holds Mr. Alalu accountable for a loss of $14,533,000, representing all of the billing by BMI during Mr. Alalu's employment. Mr. Alalu submits that the "loss" attributable to him should not exceed $80,000, which is his gain (income) during his part-time employment at BMI.

It is well settled that the burden rests with the government to prove by a preponderance of the evidence the "loss" attributable to the defendant's offense conduct. *United States v. Polar*, 369 F.3d 1248, 1255 (11th. Cir. 2004).    In determining the loss amount in fraud cases, a "reasonable estimate of the loss is appropriate." *United States v. Medina*, 485 F.3d 1291, 1303-04 (11th Cir. 2007) (citing U.S.S.G. § 2B1.1).  Nevertheless, the "***estimate***" of the loss amount "must be satisfied with '***reliable and specific evidence***,' and cannot be based upon '***speculat[ion]***.'" *Id.* (quoting *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997)) (emphasis added).   "To be interpreted as health care fraud . . . there must be some evidence present in the record that shows the patients were not legitimately prescribed . . . or that  [the defendant] made false or fraudulent representations to Medicare on the patients' behalf." *Id.*

### A.  <u>$14MM is not a Reasonable Estimate of "Loss"</u>

There was no special verdict with respect to "loss" in this case, and a finding of loss cannot be implied by the jury's verdict. Mr. Alalu was convicted under 18 U.S.C. §§1347 & 1349, neither of which requires a finding of either "causation" or "loss" as an element of the offense. The government cannot establish that Mr. Alalu's conduct caused any loss in the first instance, nor can it establish an estimate of any such loss without resorting to speculation.

Mr. Alalu did not make any representations to Medicare, much less any material misrepresentations, to cause losses even approaching $14MM, as the PSR suggests.  Mr.

Alalu provided therapy to patients and was responsible for documenting that therapy in the files of BMI, none of which was submitted to Medicare in support of payment.

Rather, the record supports the conclusion that all of the representations made by Mr. Alalu – even if inaccurate on occasion – were for real therapeutic services that he rendered on behalf of real patients of BMI, save one: On Mr. Alalu's first day of work at BMI, he mistakenly made a note in BMI's internal files that permitted BMI's bookkeeper to bill Medicare for services that were not rendered to patient "C.S.," resulting in a total loss of $168.55. With the exception of that one event, Medicare did not incur any loss as a result of any representations or misrepresentations attributable to Mr. Alalu.

The heart of the case was Mr. Alalu's "cutting and pasting" of therapy notes. But none of that conduct was the proximate cause of any loss to Medicare. Those notes were contained within patients' records that never left the BMI premises. Even assuming that Mr. Alalu's group therapy notes were not always accurate, those notes were not the proximate cause of any loss: BMI did not submit the notes to Medicare and Mr. Alalu's notes were never reviewed in either an informal or formal audit by Medicare. There is no evidence that Medicare relied on the ***substance*** of the group therapy notes in determining whether BMI was entitled to receive compensation for the services that were rendered.

Given that Mr. Alalu provided real therapy to real patients, he is not responsible for any losses for patients unless he actually knew that the patients were not Medicare eligible for those mental health services. But Mr. Alalu's position as a part-time therapist required that he respect the admission and discharge decisions dictated by the medical doctors who

were his superiors. Physicians ultimately are responsible for determining the medical necessity of services provided to patients. Under the Medicare system, "the physician is to be the key figure in determining utilization of health services- and . . . it is a physician who is to decide upon admission to a hospital, order tests, drugs, and treatments, and determine the length of the stay." S. Rep. No. 89-404, at 46 (1965). The government's own expert, Dr. Herz explained, "[T]he psychiatrist is responsible for the overall care of the patient, admission, discharge, medication and overall care." Transcript of August 6, 2012 [DE #991] at p. 29 (Herz Direct).

To Mr. Alalu's knowledge, every diagnosis was made by a doctor after a face-to-face interview. Mr. Alalu relied upon the medical doctor to determine whether a patient met the qualifications for admission or discharge. *See* Transcript of July 26, 2012 [DE #764] at pp. 194-197 (Lucas testifying that the psychiatrist, not the clinical director, "makes the ultimate decision" concerning admission, and that "only the psychiatrists" have either the "authority" or "power to admit or discharge anyone").

It is well established that a non-physician generally cannot be held responsible for providing medical services that are later deemed to have not been "medically necessary," when he followed, or relied upon, a physician's order. Non-physicians – by virtue of their education, training, and position – cannot be expected to make decisions that supersede determinations of "medical necessity" issued by physicians. The Medicare regulations explicitly recognize this common-sense concept of reliance. The Medicare program excludes individuals or entities that have provided services that are "substantially in excess of the

patient's needs" but also specifically provide that an individual may *not* be excluded "when the items or services were ordered by a physician or other authorized individual and the individual or entity furnishing the items or services was not in a position to determine the medical necessity or to refuse to comply with the order of the physician or other authorized individual." 42 C.F.R. §1001.70(c)(2). In fact the record shows that when employees of BMI questioned whether a patient was eligible for PHP they were, "instructed to just go ahead and bring the client and then let the doctor evaluate the client." Transcript of August 7, 2012 [DE #994] at p. 50 (Mercado Direct).

Mr. Alalu followed doctors' orders. Mr. Alalu had no authority to admit or discharge any patient and was required to follow the instructions of medical practitioners concerning the application of "medically necessary" treatment.

At trial there was no competent evidence that established that Mr. Alalu ever was involved in falsifying a psychiatrist's diagnosis, or that he knew that the diagnosis was corrupted. Absent such evidence, Mr. Alalu's sentence cannot be enhanced for "loss," as the Eleventh Circuit made clear in *Medina*:

> The government attempted to prove health care fraud as to Canepa and Medina by offering several other pieces of evidence. First, the government offered the testimony of Dr. Hugo Goldstraj. He testified that several prescriptions made in his name contained a forged signature and an unusually large number of refills. However, the government did not offer any evidence that any of the defendants were responsible for falsifying these or any other prescriptions. Nor is there any evidence in the record that the prescriptions at issue prescribed medications or DME that the patients did not need or did not receive. The mere fact that United or Ocean submitted prescriptions with forged signatures to Medicare is insufficient to establish fraud without some evidence that individuals at United or Ocean knew of the forgeries or forged the

prescriptions themselves. Therefore, Dr. Goldstraj's testimony is insufficient, standing alone, to establish health care fraud as to any of the defendants.

*Medina,* 485 F.3d at 1299.

While there was testimony that patients were motivated to receive therapy for non-medical reasons, the underlying motivations or objectives of the patients are irrelevant. Whether motivated to receive an exemption from taking a citizenship exam or to address an ongoing drug or addiction issue – or even a kickback – so long as the patient was deemed eligible to receive treatment and those treatments were provided to the patient there was no fraud/loss.  *See Medina*, 485 F.3d at 1304 (holding that the mere fact that patients received illegal kickbacks for patronizing Medicare providers did not so "taint" any claims the providers made to Medicare on these patients' behalf as to make these fraudulent, within the meaning of health care fraud statute); *see also United States v. Guerra,* 307 Fed.Appx. 283 (11th Cir. 2009) (unpublished) (on appeal from the re-sentencing of Medina's co-defendant for money laundering and health care fraud based on kickbacks, the Eleventh Circuit held that "Guerra actually did not merit any additional levels from the § 2B1.1 loss table because she was not responsible for any loss to Medicare. *See Medina,* 485 F.3d at 1304-05; U.S.S.G. § 2B1.1(b)(1).").

Likewise, the fact a patient may have been battling drug addiction, did not necessarily disqualify that patient from receiving services under the Local Coverage Determination for Psychiatric Partial Hospitalization Programs ("LCD"), as defense expert Dr. Cooke explained:

> Q.  In your experience with PHPs and in your view of the LCDs, do you know whether or not -- and the LCDs meaning the coverage areas for Medicare -- do you know whether or not there is an exclusion for persistent drug abuse?
>
> A.  No. As I read it, I did not see that exclusion.

Transcript of August 15, 2012 [DE #804] at p. 43 (Dr. Cooke testifying).

BMI was certified as a dual diagnosis facility, licensed and qualified to provide services to dual diagnosis patients.  And as cooperating government witness Carmen Mercado conceded:

> Q.  By admitting the dual diagnoses patients, was Biscayne Milieu trying to help them with their problem?
>
> A. Yes, sir.
>
> *  *  *
>
> Q.  You felt that this was a goal of the treatment, to help these folks who had this complicated problem, correct?
>
> A.  Yes, sir.
>
> *  *  *
>
> Q.  It is very hard to get it right with them, right?
>
> A.  Yes, sir.
>
> *  *  *
>
> Q.  Wasn't that what Biscayne Milieu wanted to do, help these folks?
>
> A.  Yes, sir.

Transcript of August 9, 2012 [DE #996] at pp. 81-82 (Mercado Direct).

The government's suggestion that Mr. Alalu should have rejected patients who exhibited signs of drug abuse ignores the reality that such patients often have underlying mental health issues that BMI was authorized to treat.

Q.   Speaking about strictly a person who was dually diagnosed, is that the kind of person, as a general rule, who should go to a strict drug abuse program?

A.   Well, it depends on who is working there. There needs to be a psychiatrist involved in that person's treatment because they are not just dealing with alcoholism or cocaine abuse, but the dual diagnosed patient is also going to have depression, schizophrenia, panic attacks, so there has to be a psychiatrist that could help with that.

Transcript of August 15, 2012 [DE #804] at p. 43 (Dr. Cooke testifying).

Whether the patient qualified for treatment was an inherently subjective call, to be made by the diagnosing physician, not a therapist or social worker.  The PSR fails to appreciate the minimal amount of discretion that a mental health counselor like Mr. Alalu possessed, when in fact he was subordinate to the physicians who directed his activities with respect to patient intake and treatment.

No witness at trial testified that Mr. Alalu corrupted the initial diagnosis or was personally aware of any corruption of the diagnosis.  The government cannot establish a "loss" for sentencing purposes based upon the office "chatter" of other BMI employees who opined that certain patients receiving therapy at BMI did not qualify for those services.  For one thing, there was no evidence that Mr. Alalu was aware of, knew, or understood the LCD, which outlines the qualifications and eligibility for patients to receive therapy at a PHP facility.  *See* Gov. Ex. 1-G.

The opinion testimony of lay witnesses – like the speculation by employees of BMI that some patients were not mentally ill – is not competent evidence:

Lay witnesses may not offer testimony "based on scientific, technical or other specialized knowledge." Fed.R.Evid. 701. The essential difference between

"lay and expert testimony is that lay testimony results from a process of reasoning familiar in everyday life, whereas expert testimony results from a process of reasoning that can only be mastered by specialists." *United States v. York*, 600 F.3d 347, 360 (5th Cir.2010). Dr. Patel is correct that at times nurses and technicians who were not qualified as experts opined about arterial blockage or whether an X-ray indicated a lesion. Although the general thrust of their testimony concerned factual matters such as Dr. Patel's reputation with staff, these witnesses arguably strayed impermissibly into expert terrain.

*United States v. Patel*, No. 09-30490, 2012 WL 3289956, at *13 (5th Cir. 2012) (unpub.op.).

[t]estimony from lay witnesses may be sufficient to establish that an individual is 'distressed' in some fashion, it may not be sufficient to establish that an individual suffers from a particular medical condition such as alcoholism or depression which only professional medical care providers may be qualified to diagnose." *Jefferson v. MilVets Sys. Tech., Inc*., 172 F.3d 919, 1999 WL 66027, at *1 (D.C.Cir. Jan. 26, 1999) (unpublished).8 *See also Villalba v. Consolidated Freightways Corp. of Del.*, 2000 WL 1154073, at *4–5 (N.D.Ill. Aug. 14, 2000) (holding that any causal connection between an accident involving plaintiff and a subsequent suicide attempt requires expert testimony due to the complex nature of depression). This Court agrees with the foregoing authority and concludes that Ferris will not be permitted to testify regarding any specific medical diagnosis of his mental ailments as the conditions from which he allegedly suffers—depression and anxiety disorder—are complex injuries beyond the knowledge of the average layperson.

*Ferris v. Pennsylvania Fed'n Broth. of Maint. of Way Employees*, 153 F. Supp. 2d 736, 746

(E.D. Pa. 2001).

Indeed, the unrebutted expert testimony by (defense witness) Dr. Cooke addressed

how to reconcile a conflict of opinion regarding diagnosis and admission to a PHP between

a non-expert employee and the responsible physician:

Q.  Who makes the final decision on admission to PHPs?

A.   As far as I know, the psychiatrist has the final decision.

> Q.   And if there is a conflict between the psychiatrist's opinion and a nurse's opinion, or a psychiatrist's opinion and a social worker's opinion, which opinion trumps?
>
> A.   The psychiatrist will include all of their thoughts and opinions, but ultimately it is up to the physician."

Transcript of August 15, 2012 [DE #804] at p. 54 (Dr. Cooke testifying).

Thus, the trial testimony of Manotte Bazile, Nicole Charles, and Madeline Lucas, for example, does not establish that Mr. Alalu was aware that certain patients (much less which ones) did not qualify for PHP treatment under the LCD.  The common theme of these lay witnesses' testimony – specifically, unlicensed social worker, Ms. Manotte Bazile – was that the Haitian patients that received therapeutic services from BMI did not qualify for those services, that they were attending group therapy just to obtain an exemption under immigration law –  available to individuals suffering from depression – to avoid taking a naturalization exam.  Ms. Bazile's opinion was based on her noting that these patients did not initially report to her that they were depressed during their Initial Psychiatric Evaluation.

> Q.   You mentioned that during the biopsychosocial workup you would talk to the patients about the symptoms they were experiencing?
>
> A.   Yes, but the majority of them, the only symptom that they had was like headache (sic) or they forgot about thing (sic)."

Transcript of July 30, 2012 [DE #___] at p. 35 (Bazile testifying).  As defense expert Dr. Cooke explained, it is common for people suffering from psychiatric disorders to deny that they are sick or in need of help:

> Q.   And the fact that people were saying that they really didn't have a mental illness to a psychiatrist, is that common or uncommon with people who really do have mental illness?

> A.   It can be common that there is often a lot of denial, patients don't think that they have a mental illness, and it really takes family members, friends, coworkers to say, you know, this person is not doing well at work, having a lot of problems at home and really needs to get treated. It may take a long time for some people to realize that they have an illness."

Transcript of August 15, 2012 [DE #804] at p. 49 (Dr. Cooke testifying).

Ms. Bazile also claimed that there were times when Mr. Alalu would ask Ms. Bazile: "[C]an you make her or him [the patient] depressed?"  This testimony would be especially damaging if it established that Mr. Alalu was attempting to manipulate the ***initial*** diagnosis of the treating psychiatrists.  However, Ms. Bazile later explained that Mr. Alalu made the statement ***after*** a patient was diagnosed by a medical doctor:

> No one tells (sic) me to make them depressed ***at that time***. There is a time for -- for everything. Usually it is when I am complaining even sometimes ***when they already see the doctor*** and I say, I am not getting anything to do my paperwork and I would be telling (sic) that."

Transcript of July 31, 2012 [DE#__] at p. 186 (Bazile testifying)(emphasis added). Therefore, that testimony does not support the inference that Mr. Alalu attempted to manipulate or corrupt the initial diagnosis of the treating doctors at BMI.

In fact, Ms. Bazile later explained that Mr. Alalu never really explained what he meant when he said, "can you make him or her depressed." Transcript of July 26, 2012 [DE#__] at p. 55 (Bazile testimony).

> Q.   Did they explain to you–did Rafael explain to you what he meant by make him or her depressed?
>
> A.   You know, he did not.

Transcript of July 26, 2012 [DE#___] at p. 56 (Bazile testimony).  The reasonable inference from that testimony is ***not*** that Mr. Alalu was asking Ms. Bazile to fabricate the symptoms of patients or somehow corrupt the diagnosis of the medical doctor.  We know from the above testimony that the diagnosis had already been made by a licensed psychiatrist.  The reasonable inference instead is that Mr. Alalu wanted the social workers of BMI to include every single symptom and observation in their description of patient behavior that would corroborate the diagnosis that the patient was mentally ill.

The jury's "not guilty" verdict on Count 11 re patient KT suggests that the jury rejected the government's theory that Mr. Alalu knew that diagnoses were corrupt and joined in a conspiracy to admit patients who did not qualify for Medicare services.  Madeline Lucas testified that Mr. Alalu agreed that patient KT did not qualify for therapy, but KT was nevertheless admitted into the program, so Medicare was "fraudulently" billed.  Transcript of 7/26/2012 [DE#764] at pp. 21-23, 193 (Lucas testifying).

Mr. Alalu contradicted Madeline Lucas' testimony.  Transcript 8/20/2012 [DE # 908] at pp. 23, 114 (Alalu testifying).  Mr. Alalu denied knowing that KT did not meet the criteria for services.  *Id.*  The acquittal on that count means that the jury believed Mr. Alalu and rejected Ms. Lucas's testimony.  The acquittal reflects the jury's assessment that Mr. Alalu should not be held responsible for any perceived inaccuracy in the diagnosis of a patient or the decision to admit and bill Medicare – even for patients that government witnesses (like Ms. Lucas) claimed were ineligible for Medicare services.

Without a detailed and specific patient-by-patient analysis of both the diagnosis and treatment of every patient that the government deems Medicare ineligible, the government cannot accurately provide the Court with evidence that establishes a reasonable estimate of the loss that Mr. Alalu intended to cause.  There was no such evidence presented at the trial, not even by the government expert witness at trial, Dr. Herz:

> Q.   [T]he patients that you spoke to us here today about, the four or five individuals, represent what percentage of the patients that you actually looked at charts on?
>
> A.   I looked at 10 -- 10 patients' records. They could have had multiple admissions, but there were 10 patients.
>
> Q.   Okay. Did you look at the other hundreds of charts?
>
> A.   No.
>
> Q.   Were you aware that they existed?
>
> A.   I assume so, yes. I didn't talk about it, but yes.
>
> Q.   Were you ever at the Miramar facility, the facility that is used by the Government to house these charts, to actually see how many boxes of charts were there?
>
> A.   I know there are a lot of them. I didn't -- I didn't inquire.
>
> Q.   Have you been there, though? Did you go to the facility and see them or are you telling us there are a lot of boxes because you have been told there are a lot of boxes?
>
> A.   I went into the facility. I may have seen the boxes. I didn't pay much attention.

Transcript of August 6, 2012 [DE #991] at pp. 124-125 (Herz testimony).  A handful of patients is a statistically insignificant sample size when compared to the entire patient population of BMI.

In summary, the government has not offered competent evidence that proves which, if any, patients were not medically entitled to receive services.  Instead, the government generalizes and alleges that whole groups of patients such as, "the Haitian-Creole speaking" patients, or patients suffering from "dementia or Alzheimer's disease," were categorically ineligible.  *Government's Consolidated Response to Defendant's Post-Trial Motions* [DE #1014] at pp. 38, 43.   Unsupported by competent expert testimony, these broad generalizations and bare allegations do not rise to the level of specificity that the sentencing guidelines require.  They also do not provide any ***"reliable and specific evidence"*** that this Court can rely on to compute loss.

Surely, the court cannot conclude that ***all*** patients receiving care at BMI did not medically qualify based on lay witnesses' opinions who lacked the requisite knowledge necessary to make determinations regarding medical necessity. Under the Medicare rules, Mr. Alalu was not only permitted, but ***obligated*** to rely on the ordered treatment of a medical doctor. Most important, there is no evidence that Mr. Alalu ever failed to give his best efforts to treat such patients.  Other than the negligible loss associated with patient C.S., there is no reliable evidence that Mr. Alalu proximately caused any loss.

The government's approach to the loss computation in this case has been arbitrary, perhaps even result-oriented.  For Manotte Bazile, the government stipulated to (and Judge

Lenard adopted) a loss figure of $3,200,000.  *United States v. Bazile*, 12-CR-20284-JAL (*Factual Proffer* [DE #18] at p. 2; *Plea Agreement* [DE #19] at p. 6).  In determining restitution, Judge Lenard computed the "Total Amount of Loss" to be the even lower amount of $789,984.  *Id*. (*Judgment* [DE #29] at p. 5).  Ms. Bazile worked as social worker full-time for BMI for 11 years (from 2000 till BMI was shut down on September 6, 2011).  Transcript of July 30, 2012 [DE #____] at p. 12.  She worked at BMI for 9 years longer that Mr. Alalu, who only worked at BMI for 1.5 years and on a on a part-time basis.  The government proposes to hold Mr. Alalu accountable for a loss four times larger than Ms. Bazile, yet Mr. Alalu was only employed at BMI for a fraction of Ms. Bazile's tenure.

Similarly, Jacqueline Moran worked at BMI for 3+ years at BMI (July 2008 until it was shut down on September 6, 2011).  The government argued that Ms. Moran's intended loss was $377,491. *Response to PSR Objections by USA* [DE #1106] at p. 1.  This court computed the "Total Restitution" to be $86,585.  *Judgment* [DE #1110] at p. 5.  Mr. Alalu worked at BMI for half the time that Ms. Moran did, yet the government proposes a loss figure 42 times larger.

These computations suggest a manipulation of the guidelines, producing an unwarranted sentencing disparity.  *See* 18 U.S.C. §3553 (a)(6).

One final observation about "loss."  The PSR equates the amount that BMI ***billed*** as the amount of ***loss***.  Yet, Medicare regulations establish a fixed fee that caps the amount that it paid for the services rendered by BMI, regardless of the amount billed by BMI for those services:

Q. If a Medicare provider submits a bill for a particular service in particular amount, how does Medicare determine how much to pay?

A. The amount of payment for any service is a set fee based on formulations . . . it is all dictated by regulation on how much is paid.

Q. You are saying by way of example, assuming that group psychotherapy is X amount of dollars, what would happen if a provider were to submit a bill for X plus Y for group psychotherapy; what would the contractor do?

A. The payment would be limited to what is allowed by regulation, so they would only get whatever the fee allowance is for that procedure regardless of how much the provider bills."

Transcript of July 9, 2012 [DE# 964] at p. 56 (Quindoza testimony).  Thus, the amount "billed" overstates the actual or intended loss.

### B.  <u>Gain as an Alternative to "Loss"</u>

When the loss from the offense "reasonably cannot be determined," the guidelines instruct courts to use ***gain*** as an alternative. *See* U.S.S.G. §2B 1.1 n.3(B). "If there is loss, but it reasonably cannot be determined, the court may "use the gain that resulted from the offense as an alternative measure of loss." *Id.*, comment n.3(B)." *United States v. Greene*, 279 Fed. Appx. 902, 908 (11th Cir. 2008) (unpublished).

Mr. Alalu never exploited his misrepresentations to extraordinarily profit from the offense.  Rather, Mr. Alalu received ordinary compensation from BMI in his capacity as a part time per diem therapist, and as part time clinical director.  He was initially paid at the rate of $50 per group with four group therapy sessions per day. Tax records show that Mr. Alalu's total compensation received from BMI in 2010 was $38,740.  By 2011, Mr. Alalu was a salaried employee of BMI, earning approximately $1,250 per week until his arrest on

September 6, 2011.  PSR at ¶184.   He earned approximately $40,000 in salary during 2011.

Mr. Alalu received no other bonuses, no profit sharing or other such payments from BMI.

His total compensation during his tenure (from 2010-2011) was approximately $80,000.

If this court chooses to use gain to the defendant as an alternative measure of loss, that

would result in a increase to the base offense level of 8, based on his compensation while

employed at BMI of approximately $80,000.  §2B1.1(b)(1)(E).

### PSR ¶153:  Adjustment for Role in the Offense

Mr. Alalu's role at BMI does not merit an upward adjustment under the guidelines,

which includes consideration of "the exercise of decision making authority, the nature of the

participation in the commission in the offense, the recruitment of accomplices, the claimed

right to a larger share of the fruits of the crime, the degree of participation in planning and

organizing the offense, and the nature and the scope of the illegal activity." U.S.S.G. §

3B1.1, Application Notes.

Mr. Alalu was a therapist who, although given the title "part-time clinical director,"

lacked any significant decision-making authority and had no power to admit or discharge any

patients at BMI.  Mr. Alalu's title paints a misleading picture concerning the nature of his

participation in the alleged fraud. In fact, it was Ms. Carmen Mercado, not Mr. Alalu, who

was responsible for overseeing the clinical aspects of BMI's operations.  Mr. Alalu did not

have any additional right to a larger share of the profits. At all times, he earned an ordinary

salary pursuant to his employment contract with BMI.  He never received a kick back or any

compensation "under the table."

Given that Mr. Alalu was employed by BMI for a shorter period of time than most of the co-defendants, and given his limited role as a part-time, salaried therapist, Mr. Alalu is eligible for a 2-level downward adjustment for minor role, as was assented to by the government – and adopted by the court – for other therapists, like Thomas Hamer. *Plea Agreement* [DE #481] at p. 5. As government counsel explained to the court at the time of Mr. Hamer's plea:

> MS. SHICK: . . .  Having said that, though, when you take a step back and look at the grander scheme of the conspiracy and the people that were really profiting off of this, ***the therapists were clearly making much less money than the case managers and recruiters, and clearly much, much less money than the owners. So, from that standpoint, it was my call to give them all  minor role,*** because I didn't think -- there was no other way for me to reduce their exposure otherwise.

Transcript of 2/15/2012 [DE #529] at pp 16-17 (Plea Colloquy) (emphasis added). The fact that Mr. Alalu exercised his right to trial – as opposed to Mr. Hamer who reluctantly pled guilty (then attempted to withdraw it then asserted his innocence at sentencing, *see post* at pp. 30-31), should not deprive him of the same downward adjustment for role in the offense.

### PSR ¶154:  Obstruction of Justice

An adjustment should not be applied for an alleged attempt to obstruct justice based on Mr. Alalu's testimony at trial.  The verdicts of guilty on Count 1 (conspiracy), Count 3 (patient C.S.) and Count 4 (patient B.H.), when considered in the context of the verdict of "not guilty" on Count 11 (patient K.T.), do not reflect a finding that Mr. Alalu was untruthful.  To the contrary, the verdicts just as likely reflect the jury's reaction to Mr.

Alalu's confession regarding his record keeping practices that, in at least one case, resulted in billing Medicare for services not rendered (Count 3 re patient C.S.).

During his testimony, Mr. Alalu admitted that he used a template to "copy and paste" therapy notes in the patient files.  Transcript of August 20, 2012 [DE # 908] at p. 126 (Alalu testifying).   The government argued that this "copy and paste" methodology would necessarily produce inaccurate billing to Medicare:

> Rafael Alalu would take one note and copy and paste the symptoms and the patient quotation and insert it on another note. He did this chronically, hundreds and hundreds of these notes, but he didn't do a very good job because he would get crossed up in his own fraud.

Transcript of August 21, 2012 [DE#____] at pp. 71-72. (AUSA Davis closing).  Mr. Alalu's template methodology was conduct in furtherance of the conspiracy, according to the government.

The jury might well have convicted Mr. Alalu based on their assessment that Mr. Alalu was reckless, even deliberate or intentional, in using a short cut in his record keeping that could produce inaccurate billing.  Thus, the jury might have rejected a good faith defense even if it did not necessarily disbelieve Mr. Alalu, who candidly admitted he took those shortcuts which, in at least one case, resulted in billing Medicare for services not rendered (to patient C.S.).  The jurors may have found Mr. Alalu criminally responsible for aiding and abetting the conspiracy by adopting a record keeping practice that was so prone to produce inaccurate billing – even if it was not Mr. Alalu's intention to profit from that conduct, much less "defraud" Medicare of money.

Indeed, that is the most logical explanation for the jury's decision to convict of Count 3 (patient C.S.) and Count 4 (patient B.H.), while acquitting Mr. Alalu of Count 11 (patient KT).  Counts 3 and 4 involved reckless record keeping.  Count 11 did not.  As to Count 11, Madeline Lucas testified that Mr. Alalu knew that patient KT did not qualify for therapy but was nevertheless admitted into the program, so Medicare was "fraudulently" billed.  The acquittal reflects the jury's assessment that Mr. Alalu was not criminally responsible for BMI's admission of – and its billing Medicare for – a patient, regardless of whether Mr. Alalu (in his lay opinion) disagreed with the psychiatrist's diagnosis or the eligibility determination.  To the extent that the jury decided to hold Mr. Alalu strictly liable for his record keeping practices, while absolving him of criminal responsibility for any faulty diagnoses or admission decisions, it did not reject Mr. Alalu's testimony that he relied on the diagnoses of the psychiatrists.

A similar issue arose at the sentencing of a therapist, Thomas Hamer, who objected to ¶36 of his PRS stating "it would be unlikely or nearly impossible for a patient to get to me for me to do a biopsychosocial without having seen a psychiatrist."  Transcript of 5/11/2012 [DE #595] at p.4 (Sentencing).[1]  The government disagreed with Mr. Hamer, accusing him of lying to the court:

> MS. SHICK: ***Well, as far as the fraud is concerned, he's making statements to the Court that are not true.***
>
> \* \* \*
>
> Well, first, when we debriefed him, he admitted as much, that most of the patients that were brought in were not seen by a psychiatrist.

---

[1]  A highlighted copy of the Transcript of 5/11/2012 [DE #595] is attached to this motion as Exhibit 1.

And moreover, again, as I said, the overall scheme, which, again, everyone that participated in it was aware, that the people that were being seen -- it mostly fell on the therapists' shoulders to do the initial biopsychosocial assessments.

\* \* \*

So he knew, just like the other therapists knew, that the overarching theme and the overarching scheme was to admit the patients, be seen by a therapist, put into a group, start billing; and then, if and when time permitted, sometimes they would be seen by a psychiatrist, most oftentimes not.

Transcript of 5/11/2012 [DE #595] at pp.5-7 (Hamer Sentencing).  The dispute concluded

with a heated exchange between the parties, which the court resolved in Mr. Hamer's favor:

MS. SHICK: . . . But the statement he just made -- again, I'm not going to not correct the record when *he says something that again rings untrue* when he says, I didn't know -- it's virtually impossible for me to see a patient unless a psychiatrist approves them for admission and saw them first.

*That's not true.*

THE DEFENDANT: *It is true, your Honor.*

THE COURT: I'm going to -- I'll sustain the defense objection to Paragraph 36.

Transcript of 5/11/2012 [DE #595] at p. 8 (emphasis added).

During allocution, Mr. Hamer told the court that he relied on the diagnoses of

psychiatrists and provided real services to Medicare-eligible patients:

If I had to do it all over again, I would do at least 90 percent exactly the same way, because I had the opportunity to work with some of the scum of the earth, some of the dregs of our society, people who were not only addicts, but they had psychological problems as well. *And every one of them that came before me had a proper diagnosis from a psychiatrist and they had a drug problem or generally just a diagnosis*.

I worked with these people because I saw in them something I think most people did not and I give them something they generally didn't get, and that was hope. They got self-esteem.

I saw families reunited; I saw lives saved; I had patients that I would have sworn had Alzheimer's and I worked with them and worked with them, and it turned out they turned into something quite different.

You have the problem of drugs, which is bad enough, tearing apart our society. You have psychiatric diagnoses. And I can tell you, your Honor, with 100 addicts, you're going to have at least 50 of them with major psych problems, probably higher.

\* \* \*

. . . If I had thought even after meeting with ***these agents who used the words to describe the place as a criminal enterprise, I did not see that,*** because I saw ill, suffering people every day. And I helped them to the best of my ability.

And I am not saying that I am perfect. I am definitely not saying that. I am not saying I am an angel, your Honor. But I am saying that me -- that I and my fellow therapists were fighting on the side of the angels to reduce the use of drugs, particularly under this incredibly vulnerable segment of our society where they already had psychiatric disorders...

Transcript of 5/11/2012 [DE #595] at pp. 43-45 (emphasis added).

Mr. Alalu similarly testified that he only treated patients who, to his knowledge, a licensed psychiatrist had diagnosed with a condition making the patient eligible for Medicare-paid  services – even while admitting to the copy and paste method of record keeping.  The verdicts, seen through this prism, do not reflect a finding that Mr. Alalu lied.

PSR ¶143 addresses Mr. Alalu's testimony about the billing for patient CS.  Mr. Alalu admitted that he prepared inaccurate therapy notes for that patient.  The jury treated that admission as a confession of guilt, so they found him guilty.  Far from obstructing the conviction, the jury may have concluded he practically invited it.

PSR ¶144 alleges that Alalu testified that "after Lucas informed she [sic] had not seen B.H., he returned the list to the management office and that he had no further involvement in the matter." There is no evidence that establishes this to be an inaccurate statement:

Q.   Did Rafael Alalu have another conversation with you about the note?

A.   You know, he said he understood, he didn't want me to do anything that I felt uncomfortable with, and he said that he would speak to Sandra and see how it could be taken care of. I do remember him coming back to me later that day and he said it was taken care of.

Transcript of July 25, 2012 [DE#763] at p. 167 (Lucas testifying). This testimony does not contradict Alalu's assertion that he returned the paperwork to the management office. Rather the jury likely regarded this testimony as another confession by Mr. Alalu regarding ineffective record-keeping practices at BMI, for which the jury found him guilty.

PSR ¶145 alleges that Mr. Alalu falsely denied having fabricated patient notes, falsely reported that all patient quotations were personally observed by him, falsely denied knowing that Haitian patients attended BMI just to procure a form N-648 ( which would exempt them from taking the U.S. citizenship exam), and falsely denied having told Bazile to fabricate documents to make Haitian patients appear depressed.

As noted above, Mr. Alalu confessed to using a copy and paste methodology, which could produce inaccurate notes. He always prepared the notes himself from his own memory, unlike therapists Thomas Hamer, John Jackson, Jose Rojo, and Madeline Lucas who paid others to draft ficticious group therapy notes for inclusion in the patient's file. The jury's verdict on Count 11 is a rejection of the government's theory that Mr. Alalu knew the diagnoses of Haitians patients (or any other patients) was corrupted. Finally, Alalu never

instructed Bazile to fabricate documents to make Haitian patients appear as if they were depressed.

> Q.   Did they explain to you–did Rafael explain to you what he meant by make him or her depressed?
>
> A.   You know, he did not."

Transcript of July 26, 2012 [DE#___] at p. 56 (Bazile testimony).

Applying an obstruction enhancement to Mr. Alalu would suggest a penalty for exercising his right to testify, particularly when the government has not sought, and the court has not applied, the enhancement against co-defendants who admitted during trial that they lied to the FBI repeatedly during the course of the investigation, typically by denying their own liability. *See* Transcript of July 31, 2012 at p. 236 (Manotte Bazile); Transcript of July 19, 2012 [DE#989] at pp. 92-93 (Barabara Morales-George); Transcript of July 17, 2012 [DE#970] at p. 125 (Roselyn Nicole Charles).

For example, for fifteen months Madeline Lucas was debriefed by prosecutors and agents and admittedly lied about her culpability, *see* Transcript of July 26, 2012 [DE#764] at p. 189, yet received no obstruction enhancement.  Indeed, she was rewarded by the government with a 5K1.1 "substantial assistance" motion [DE #975] which the court granted [DE # 985].

Mr. Hamer was not enhanced for "obstruction of justice" despite his lawyer admitting that Mr. Hamer lied to the court when, just after his arrest, he provided false information to the probation officer who was preparing the Pretrial Services Report for a United States Magistrate Judge:

MR. BARZEE: Your Honor, with the Court's permission, there were a couple of corrections I'd like to make to Mr. Hamer's statement to pretrial services when he was initially interviewed.

THE COURT: Because you're concerned I'm not going to give him acceptance of responsibility?

MR. BARZEE: Because I'm concerned that it's important for him to be fully candid with the Court.

THE COURT: All right.

MR. BARZEE: The first is his date of birth is wrong.  His actual date of birth is April 23rd, 1953, as opposed to April 23rd, 1948. The second is that he has a history of alcoholism in his family and is probably an alcoholic himself. He told Pretrial Services that he did not have a problem with alcoholism.

Transcript of 2/15/2012 [DE #429] at p.18 (Hamer Plea Colloquy).

The government did not seek an obstruction enhancement even after accusing Mr. Hamer of repeatedly lying to the court both before *and after* he entered a plea agreement. The first lie, according to the government, *Government's Objections to the Presentence Report Regarding Acceptance* [DE #561] at p. 2, was at the December 16, 2011, status conference, when Mr. Hamer asked the court to assign a different court appointed lawyer, complaining that his first assigned lawyer did not believe in his innocence:

DEFENDANT HAMER: Yes, Your Honor. Mr. Spivack has shown no credible interest in my innocence of the charges as presented and, therefore, no interest in actually defending my case to prove my innocence.

From the very outset, this defendant has asserted and maintained his innocence, yet felt demeaned by Mr. Spivack's responses which have been both disbelieving and dismissive.
                                        *  *  *
*I was never part of any conspiracy, and I never committed any health care fraud.* I work two jobs and I never received a dime I didn't earn.

* * *

Mr. Spivack does not appear to have tried to distinguish between innocent mistakes, misunderstandings, and regulatory failures, and intentional criminal acts. ***I never committed an intentional criminal act.***

* * *

For the foregoing reasons and others, I request this Honorable Court to appoint another legal counsel, one that will fight for my innocence.

Transcript of 12/16/2011 [DE #386] at pp. 15,16, 21, 22 (Status Conference).

The second lie, according to the government, was in a letter Mr. Hamer wrote to the court after entering his guilty plea, in which he contradicting his admission of guilt:

"I assert that I am innocent because I never conspired, intended, nor entered into any agreement with anyone for the purpose of unlawful enrichment . . . I should not have pleaded guilty merely because I was afraid of a lengthy prison sentence."

*Notice of Filing Defendant's Letters to Court* [DE#543-1] at 1-2.  This court found that these "later assertions of innocence are not credible."  *Order Denying Defendant's Request to Withdraw Guilty Plea* [DE #552] at p. 3.

At Mr. Hamer's sentencing, in an effort to persuade the court to deny Mr. Hamer credit for acceptance of responsibility, the government seized on this court's finding that Mr. Hamer's "later assertions of innocence are not credible" to reiterate that Mr. Hamer was lying to the court:

MS. SHICK: . . . And, your Honor, as the Court pointed out in its own order, which was entered into shortly after the withdrawal of the plea, or attempted withdrawal of the plea -- and the Court's order is Docket Entry 552 -- the Court specifically noted that the Defendant's later assertions of innocence are not credible.

Obviously, the Government agrees, as does Probation.

First and foremost, your Honor, I have never had a defendant who has come forward, denied relevant conduct, denied that he had done certain things and then received acceptance. The acceptance --

\* \* \*

Well, specifically, your Honor, he said he wasn't involved in a conspiracy and he said he didn't commit healthcare fraud.

\* \* \*

And specifically, if you turn to -- I'll say as a whole, your Honor, after having read the sentencing memorandum, the only thing that I saw throughout that was consistent was, "It's somebody else's fault; I was pushed into this; I didn't really do what I was doing. It was because somebody ordered me to do it."

Transcript of 5/11/2012 [DE #595] at pp. 9-11.  Even after accusing Mr. Hamer of lying to the court for a third time at sentencing, *id.* at pp. 5-8, *see ante* at p. 24 ("he's making statements to the Court that are not true . . . he says something that again rings untrue . . . That's not true"), the government still did not seek an enhancement for obstruction.

There is more: The government alleged that Mr. Hamer had falsified records at BMI after being told by federal agents and the prosecutor that he was a target of the criminal investigation:

MS. SHICK:   After, after this Defendant met with the agents in this case, after this Defendant met with me in this case, he was aware that he was a target.

\* \* \*

But in any event, the most significant thing Magistrate Judge White found was that even after having met with us, he went back and committed fraud, blatantly.

\* \* \*

he met with the Government and he met with the agents. He knew -- we knew what was going on at Biscayne. And he chose, instead of quitting . . . [he] went back, committed fraud.  That's a big deal.

Transcript of 5/11/2012 [DE #595] at pp. 16, 19-21.  The government still did not seek an enhancement for obstruction.

Given that the government has not sought enhancements against any other defendant – not even Mr. Hamer – the court should reject the government's effort to penalize Mr. Alalu for exercising his right to testify at trial.

<u>**PSR ¶ 151 Sophisticated Means**</u>

The jury's verdict reflects its assessment that Mr. Alalu furthered the scheme to defraud by recklessly "copying and pasting" group therapy notes from one patient to another. He did not form any corporate entities, authorize any monetary transfers, or submit any bills to Medicare. The government's description of Mr. Alalu's role in the fraud is not "sophisticated" under the Sentencing Guidelines, which define "sophisticated" as being "especially complex or intricate," for example establishing offices in multiple jurisdictions or using "fictitious entities, corporate shells, or offshore financial accounts" to "hid[e] assets or transactions." U.S.S.G. § 2B1.1(b)(10), Application Note 8(B).

**III.    <u>Downward Departure</u>**

We respectfully move for a downward departure on the grounds that: 1) the offense level determined under the advisory Guidelines "substantially overstates the seriousness of the offense. U.S.S.G. §2B1.1, n.19(C) (2011);  and 2) the unique facts of this case take it outside the "heartland" of fraud cases. U.S.S.G. §5K2.0;  *Koon  v. United States*, 518 U.S. 81, 95-96 (1996).  The central feature of both bases for departure is that the alleged offense was not motivated by, and did not result in, any significant financial gain to Mr. Alalu.

In the classic fraud case, the defendant causes losses to the victim – e.g., by promoting a non-existent or ineffective product, engaging in a Ponzi-scheme, or billing an entity such

as Medicare for goods and services not provided, etc. – for the purpose of obtaining the victim's money for the defendant's own enrichment. In that scenario, the fraud amounts to theft for the defendant's benefit, often to support the defendant's lavish lifestyle. Thus, in the classic fraud case, the defendant's gain is comparable to, or bears some rational relationship to, the victim's loss.

That type of fraudulent scheme is qualitatively and significantly more egregious than a fraud case involving alleged misrepresentations made in internal records that are never submitted to Medicare in which the defendant does not benefit or seek to benefit from the misrepresentations. Yet, the Guidelines do not distinguish between theft-type fraud cases and fraud cases not motivated by gain – particularly one in which it appears likely that the jury convicted only because of the record keeping practices of the defendant.

This specific factor is not mentioned in the Guidelines and, therefore, may be considered as a ground for downward departure under both U.S.S.G. §2B 1.1, n.19 (C) and U.S.S.G. §5K2.0.

### IV.    Downward Variance

To the extent that enhancements for "loss" and other factors or enhancements produce a sentencing range that is disproportionate to Mr. Alalu's offense conduct and offender characteristics, we respectfully request the Court to grant a downward variance from that range. The variance request is based on, among other factors, a policy disagreement with how harshly the Guidelines treat offenders in fraud cases, where the offenders do not exploit their alleged misconduct for financial gain. *See generally United States v. Cavera*, 550 F.3d 180,

191-92 (2d Cir. 2008) (en banc) (holding that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses"); *see generally Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

To be sure, the Guidelines often frustrate their very purpose of avoiding disparities in sentencing when they are mechanically applied to Medicare fraud cases. In such cases, the billing submissions to Medicare alone can become the driving force behind a defendant's guideline range, to the exclusion of any other factor relating to a defendant or his particular conduct. As Judge Rakoff recognized, the "guidelines' fetish with abstract arithmetic" can yield a "barbarity" and a "travesty of justice." *See United States v. Adelson*, 441 F.Supp. 2d 506, 511-12 (S.D.N.Y. 2006), aff'd 301 Fed.Appx. 93 (2d Cir. 2008) (affirming 42 month sentence imposed upon defendant convicted of accounting fraud notwithstanding the recommended guideline range of life); *see also United States v. Prosperi,* 686 F. 3d 32, 39 & 45 (1st Cir. 2012) (affirming downward variance from 87-108 months to 6 months of home detention because the loss numbers did not take into account the personal characteristics of the defendant).

The sentencing court must consider the "history and characteristics of the defendant" equally with "the nature and circumstances of the offense," 18 U.S.C. §3553(a)(1), even though the Sentencing Guidelines give virtually no weight to these factors and focus almost exclusively on the amount of the loss. *See Rita v. United States,* 551 U.S. 338, 364-65 (2007) ("The Commission has not developed any standards or recommendations that affect

sentencing ranges for many individual characteristics.  Matters such as age, education, mental or emotional condition, medical condition (including drug and alcohol addition), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are ordinarily not considered in the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing court to consider."); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month downward variance based in part on the "support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").   The advisory "Guidelines should be the starting point and the initial benchmark," but they are "not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007).  This court has broad discretion to impose a sentence far below that range. *See id.* at 49-51; *see also generally United States v. Booker*, 543 U.S. 220 (2005).

After considering the Guidelines, a sentencing court "should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the factors presented." *Gall*, 552 U.S. at 49-50. This is based on the "federal judicial tradition" that a court "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id*. at 52. Ultimately, the overarching consideration is that the sentence must be "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. §3553(a).

### § 3553 (a)(1):      The Nature and Circumstances of the Offense
### and the History and Characteristics of the Defendant

Although Mr. Alalu was convicted of defrauding Medicare, it was clear from the evidence at trial that Mr. Alalu was not the architect of the business model of BMI. He was not the CEO, President, or CFO, but rather he was employed as low level group therapist and as BMI's clinical director for *less than one year*, between October 25, 2010 to September 6, 2011. During that time he was merely a *part-time* employee.  Transcript of 7/26/2012 [DE#764] at p. 199 (Lucas testifying that "Mr. Alalu was only present" at BMI from 8:30 [a.m.] until 1:00 [p.m.] three days a week").

Mr. Alalu was not calling the shots.  Mr. Alalu did not offer or pay any kickback or bribe to recruit Medicare beneficiaries as patients of BMI; pay or receive any kickbacks or bribes of any kind; share in the profits of the business; or launder the proceeds of the alleged fraud.  Rather, the record reflects that Mr. Alalu was paid an ordinary salary in accordance with the terms of his arms-length employment contract with BMI.

The worst that could credibly be said about Mr. Alalu was that multiple group therapy notes for different patients appeared to mirror each other.  There was no allegation made against Mr. Alalu, unlike other therapists, that Mr. Alalu did anything other than offer guidance, help, and counseling in his therapy sessions.  While other therapists conducted their therapy sessions under the influence of drugs or alcohol, Mr. Alalu conducted his with patience and understanding.  Consistent with all of the letters that have been submitted on his behalf, Mr. Alalu cared about his patients and genuinely tried to help them.  This man was

passionate about treatment. This man gave of himself to his patients. He at all times administered the therapy that was prescribed, in a professional and compassionate manner.

In fraud cases, the motive is virtually always greed. In the typical case, the fraudster exploits his offense conduct so that he can live beyond his means at the expense of the victims. Mr. Alalu has never lived an extravagant lifestyle. Rather, he is a friendly, modest, and respectful person. Indeed, the Court had the opportunity to observe Mr. Alalu throughout the trial. Mr. Alalu displayed the utmost decorum for the Court and the justice system during this case. The letters submitted to the Court portray a person who would never intentionally harm anyone, who is devoted to his family and his faith, and who has helped the community.

Mr. Alalu is a non-violent, first-time offender. If this case is atypical it because of the mitigating, not the aggravating, factors.

### § 3553 (a)(2):    Deterrence, Public Protection, Punishment, and Rehabilitation

A lengthy term of imprisonment is not necessary to deter Mr. Alalu from future criminal activity. He has none of the hallmarks of a recidivist, especially in view of his previously-clean record at the age of 47 and the fact that the offense was not motivated by greed or self-enrichment. There is no reason to worry that Mr. Alalu is likely to commit future acts of fraud. By the sentencing date, he will already have been in custody nearly three months. No period of additional incarceration is necessary to teach him what he has already learned during this traumatic ordeal.

The public should not view Mr. Alalu as a threat. As portrayed though the countless supporters advocating for Mr. Alalu, this man is an asset to the community at large. Any

prolonged term of incarceration will not only handicap this man's family but also his community as whole-which depends on him to offer guidance and counseling to those less fortunate.

Rehabilitation is not a concern because of his lack of prior convictions. The problems from which he suffers, such as alcohol abuse, can best be rehabilitated through therapy in the outside world, not through incarceration. Given Mr. Alalu's penchant for community service, this Court should consider the value that could be derived from a substantial community service requirement in lieu of a portion of incarceration. As one commentator has noted, "community service can utilize the expertise of the white-collar offenders for public advantage." Elizabeth Szockyj, Imprisoning White-Collar Criminals?, 23 S.Ill. U. L. J. 485, 498 (1998-99).

### § 3553 (a)(3),(4):     The Sentences Available

The offenses of conviction do not carry a mandatory sentence. The Sentencing Guidelines are advisory and a guidelines sentence is not presumptively reasonable. Under *United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008), this Court has wide discretion to impose a sentence well below the Guideline range.

### § 3553 (a)(6):     The Need to Avoid
####      Unwarranted Sentencing Disparities

In imposing sentence on Mr. Alalu, the court should consider those sentences already imposed on defendants similarly situated.   Perhaps the best point of reference would be the sentence imposed upon Thomas Hamer, another therapist who conducted group therapy at

BMI.  Mr. Hamer was sentenced to a term of imprisonment of twenty-four months.  [DE #581].

Mr. Hamer's agreed factual basis for a guilty plea outlines very similar conduct as that alleged by the government against Mr. Alalu.  They both were employed at BMI for approximately the same amount of time, and they both conducted group therapy sessions for patients that had been diagnosed by a medical doctor as being eligible for PHP treatment. However, there is one distinction: "HAMER paid a friend of his, who was not a therapist, to create fraudulent treatment plan reviews for his patients. This friend fabricated these notes and plans, and HAMER turned them into Biscayne Milieu with his signature." *Agreed Factual Basis for Guilty Plea* [DE #482] at p. 2.  There was no evidence that Mr. Alalu paid others to fabricate therapy notes.

Having argued strenuously against giving Mr. Hamer any credit for accepting responsibility, the government is now hard-pressed to distinguish these two therapists on that basis, particularly after expressing concern that Mr. Hamer might "repeat the conduct"

> MS. SHICK: . . . And, your Honor, the important thing that I'm trying to emphasize here is, if somebody feels that way, which Mr. Hamer clearly does, and he's entitled to feel however he wants to throughout this, ***but how are we to be certain that once this Court sentences him he's not going to go out and repeat the conduct?***

Transcript of 5/22/2012 [DE #595] at pp. 15-16 (Hamer Sentencing) (emphasis added).

Mr Hamer was still equivocating about his own guilt, even as the court was expressing its desire to be lenient:

> MR. HAMER:  So I did not see this vast criminal conspiracy. And I --

THE COURT: Do you see it now?

THE DEFENDANT: No, sir. I saw errors. I saw mistakes. I saw -- we had a new supervisor who came in who said, "We're not going to permit any of this stuff." The case managers were responsible for taking care of these patients, not just recruiting them.

So I'm sorry if it shocks the conscience of the Court for me to say, "You know what, your Honor? I saw really good things. And I did really good things. And I would continue."

\* \* \*

So from the very first, when I went to the FBI, I gave them all the information that I knew, which was that patients were paid to come to group. And that was an insult to me, because I want people coming to groups because they want to get better, not because they're getting paid to be there.

\* \* \*

THE COURT: But you were working at a place where the people running it are getting paid millions of dollars so – from Medicare that they don't deserve so you could have your patients. You would do that again?

THE DEFENDANT: No, your Honor, because I didn't know about that. I never knew.

I came to work six days a week, got paid for five. I got an average from the hours I worked of 18 bucks an hour. That's not unjust enrichment.

But I will tell you, I was nevertheless enriched by doing what I did for the patients that I had.

I'm not trying to frustrate your Honor. I am not.

I am saying that if --

THE COURT: I know you may not be trying to, but, trust me, you are.

\* \* \*

Therapists who were going to get a low sentence and they're talking themselves out of it?

I'm going to take a five-minute break.

*Id.* at 45-46, 48-50.

After all of this drama, a stipulated loss of $15,972,300, *Plea Agreement* [DE #481] at p. 5 (higher even than the loss that the government proposes to attribute to Mr. Alalu), and a stipulation in Mr. Hamer's plea agreement that he would not seek a downward variance, *id.* the court rejected the government's recommended bottom-of-the-guidelines sentence of 51 months, *id.* at 29, and granted a *sua sponte* variance:

> THE COURT: After considering the statements of the parties, the presentence reports and all the statutory factors and considering that the total offense level is 24 with a criminal history category I for an advisory guideline range of 51 to 63 months, the Court must fashion a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, just punishment, adequate deterrence to the Defendant and others and to protect the public from further crimes of the Defendant.
>
> ***I find that a sentence within the advisory guideline range is greater than necessary to accomplish those goals of sentencing.***
>
> I feel that when I sentence somebody I really want to look on their entire lifetime of contributions, good and bad, and what they did in this case and what's really necessary. The last hour and a half have made it a lot more difficult for me to do that. But I really don't think somebody should get extra time in prison because they can't keep their mouth shut.

*Id.* at 51 (emphasis added).

The government may propose a comparison between Mr. Alalu and the former ***full time*** Clinical Director, John Jackson. While the two may have had a similar title – although Mr. Alalu was only a ***part time*** Clinical Director – the record shows that their conduct was markedly different. For one, John Jackson organized a kickback system at BMI and disguised the illegal payments to the recruiters by having BMI hire them as employees with the false title of "case managers." Indeed, John Jackson himself recruited patients and received kickbacks for doing so. Second, Jackson set up "half way houses" to house patients

and required them to receive therapy at BMI, for which he received a kickback.  Jackson also admitted that he paid patients to attend therapy sessions at BMI.  *Factual Proffer* [DE #11] at pp. 2-3 in *United States v. Jackson*, 11-CR-20617-UNGARO.

Mr. Alalu was not involved in recruiting, housing or paying patients.  He was not involved in giving, receiving or disguising illegal kickback payments.  Mr. Alalu's conduct more closely resembles the conduct of Mr. Hamer than Mr. Jackson.

 The sentence imposed should reflect that Mr. Alalu is not a defendant who pilfered the coffers of Medicare to live above his means.  There is no evidence that Mr. Alalu was negligent in his patient care.  Mr. Alalu always tried to add a human element to what the government calls the "revolving door" of patient care at BMI.  Whether that was embodied in meeting all of the patients at BMI in the cafeteria to greet and offer them breakfast, or giving his home telephone number to patients that needed extra attention and support, this is a man that dedicated his life to helping others.  As this Court commented after the verdict was rendered:

> Mr. Alalu, I know that I truly believe that you and many other people that were working there started out with the best of intentions and were not paid more than your salary and I think when it come down to sentencing, I am certainly going to give a lot of serious consideration to that.

Transcript of August 24, 2012 [DE #___] at p. 33.

**§ 3553 (a)(7):        The Need to Provide Restitution
                       to Any Victims of the Offense**

To Mr. Alalu's knowledge, he always provided real therapy to Medicare-eligible patients.  Because the prescribed patient care was administered in a professional and compassionate manner, neither Medicare not the patients were victimized by Mr. Alalu.

Mr. Alalu has a negative net worth of ($419,491).  PSR ¶ 187.  Given Mr. Alalu's limited resources and his role in the offense, the defense submits that there is no basis to impose**.**

**V.     Conclusion**

For the reasons stated above, the Court should impose a Zone C sentence, no greater than necessary to achieve the goals of sentencing as outlined in §3553(a).

Respectfully submitted,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Ph. (305) 371-6421 –  Fax (305)358-2006
E-mail: HSrebnick@RoyBlack.com

By:     /s/   Howard Srebnick_____
       **HOWARD SREBNICK**
       Florida Bar No. 919063

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a first draft of this memorandum was provided to AUSA Mike Davis on **Wednesday, December 12, 2012**, and this final version is being electronically filed via CM/ECF on **December 16, 2012**.

/s/   Howard Srebnick_____
**HOWARD SREBNICK**