UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-20587-Cr-Scola(s)

UNITED STATES OF AMERICA

vs.

RAFAEL ALALU
_____/

## GOVERNMENT'S  RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States submits this response to the defendant's Sentencing Memorandum, which

is docket entry 1114

## I.   INTRODUCTION

The defendant comes before this Court for sentencing following his conviction for his role

in the Biscayne Milieu fraud scheme.  As the Court may recall from its observations of the defendant

during his testimony, this defendant is articulate, well-educated, and intelligent.  He was not

unknowingly drawn into a culture of fraud, only to later drop his guard and submit.  Rather, from

the start this defendant knew what he was getting into, and he facilitated Biscayne Milieu's criminal

activity almost from the moment that he walked in the door.  This is reflected by the defendant's

conduct surrounding his conviction on Count 3.

On the morning of the defendant's first day at work – February 2, 2010 – patient C.S. was

receiving treatment at a local dialysis center.  Biscayne Milieu, however, billed Medicare for group

therapy sessions for C.S. that morning.  The defendant helped Biscayne Milieu conceal its

fraudulent billing by falsifying group therapy notes for two sessions for C.S.

These were but two of a stream of false records that the defendant generated to advance the Biscayne Milieu fraud scheme.  At trial, the government moved in evidence approximately 87 sets of copied and pasted group therapy notes (Gov. Exhs. 142-a thru 145-i).  The government supplemented these with the seven distinct notes for a group therapy session on February 24, 2010 (Gov. Exh. 230), which was about three weeks after the C.S. incident.  From there, the government showed how the defendant copied and pasted those notes into seven other notes for a group therapy session five weeks later on March 31, 2010 (Gov. Exh. 231).

The defendant's falsification of records were not technical transgressions or mere bad record-keeping.  As government witness and career Medicare official Stephen Quindoza explained, Medicare is a trust system.  The defendant knew that Biscayne Milieu made money by breaching Medicare's trust, and he falsified records to help conceal the fraud from Medicare.

The defendant's role in the scheme transcended merely falsifying his own records.  Shortly after the Macli family learned that Biscayne Milieu was under FBI investigation, they recognized that John Jackson had become too much of a liability.  Since Biscayne Milieu was built entirely on fraud, adhering to the law was not a realistic option – unless the Macli family were to have simply shut down operations.  So the Macli family cut Jackson loose and sought someone who they could trust to continue the fraud on the clinical side of the house, but to do so more carefully.  They turned to the defendant, designating him as acting clinical director in July 2010 and permanent clinical director in October 2010.[1]

_____

[1]DE 908:72 (Alalu testimony of 8/20/2012).  Although the defendant claims in his submission that he only worked three mornings a week (DE 1114:36), on cross-examination the defendant confirmed that once he became permanent clinical director in October 2010, he worked five mornings a week (DE 908:121-22).

-2-

The defendant responded to his added responsibilities by loyally and actively promoting the fraud scheme among the staff reporting to him.  When Manotte Bazile told the defendant that individuals she interviewed were not mentally ill, the defendant asked her if she could "make her or him depressed."  The defendant openly joked with another therapist about falsifying records, saying that they were "doing it the Cuban way" – a shorthand that they used for falsifying records.  When others at Biscayne Milieu showed less enthusiasm about doing things "the Cuban way," the defendant sought to parry their resistence.  Faced with staff complaints about various improprieties at Biscayne Milieu, the defendant tried to deflect or quiet them.

The defendant spent mornings as Biscayne Milieu's clinical director at a salary of $2,500 bi-weekly and spent afternoons at his outside private practice.  The defendant depicts his salary as reflecting an "absence of greed, enrichment, or any extraordinary financial reward" (DE 1114:3).  However, it is better understood as the relatively low price that the defendant placed upon his willingness to participate in the Biscayne Milieu fraud scheme.  This was easy money for the defendant, and he did not care that he was supplementing his income by promoting a fraud mill.

Before the Court, the defendant's dishonesty and fraud took on an added and egregious dimension when the defendant elected to repeatedly commit perjury.  As outlined in more depth later in this submission, much of the defendant's perjury commenced on direct examination – that is, on subjects of testimony initiated by the defendant.  The unavoidable conclusion that flows from this is that the defendant's perjury was very much premeditated.  The defendant knew in advance what he was getting himself into – and decided to go forward anyway.  *See United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (O'Connor, J., sitting by designation)  (recognizing perjured testimony as a consideration that can justify variance above advisory guidelines), *cert. denied,* 131

S. Ct. 1540 (2011).  As much as the defendant struggles to blame everyone else for the fraud at Biscayne Milieu, he cannot engage in that exercise when it comes to locating the party responsible for his own false testimony.

While the defendant's submission talks about some of his supporters and the things that he did when he was *outside* the walls of Biscayne Milieu, the reason for the pending sentencing is because of what the defendant did while *inside* the walls of Biscayne Milieu, as well as his blatant perjury.  It is commendable that the defendant has friends and associates who are willing to speak on his behalf.  However, the defendant's supporters were not present when the defendant was promoting the massive fraud at Biscayne Milieu.  Nor were they present when the defendant repeatedly perjured himself before this Court.

The government will be advocating an offense level of 30, which at a criminal history category of I scores out to an advisory guideline range of 97-121 months imprisonment.  Based upon the seriousness of the defendant's criminal conduct, his role in advocating and promoting fraud by others at Biscayne Milieu, and his egregious and repetitive perjury, the government anticipates recommending a sentence of 121 months imprisonment.

The remainder of this submission is organized as follows.  Section II responds to the defendant's objections to the recommended calculations under the Sentencing Guidelines.  Although the government ultimately has elected not to oppose the defendant's objection to a three-level upward adjustment for aggravating role under U.S.S.G. §3B1.1(b), in all other respects the government recommends that the Court overrule the defendant's remaining objections.  Section III summarizes the most pertinent considerations in determining an appropriate sentence and briefly addresses several remaining defense arguments not discussed elsewhere in this submission.

## II.   RESPONSE TO DEFENDANT'S OBJECTIONS TO RECOMMENDED GUIDELINE CALCULATIONS

Although the defendant concedes that his Chapter 2 offense level is controlled by §2B1.1, which starts with a base offense level of 6, he objects to the remaining recommended guideline calculations that result in the recommended total offense level of 33.

In particular, the defendant objects to the following recommendations:

- the 20-level upward specific offense characteristic under §2F1.1(b)(1)(K) for a loss greater than $7 million, but not greater than $20 million;

- the 2-level upward specific offense characteristic under §2F1.1(b)(9)(C) for sophisticated means;

- the 3-level upward adjustment under §3B1.1(b) for managerial role;

- the absence of a 2-level downward adjustment under §3B1.2(b) for minor role; and

- the 2-level upward adjustment for obstruction of justice.

As discussed below, the government has elected not to oppose the defendant's objection to the 3-level upward adjustment under §3B1.1(b) for managerial role.  However, in all other respects, the defendant's objections should be overruled, and his total offense level should be a level 30.

## A.   §2F1.1(b)(1)(K) – LOSS CALCULATION

### 1.   General Principles

The PSI recommends a 20-level upward specific offense characteristic under §2F1.1(b)(1)(K) for a loss greater than $7 million, but not greater than $20 million, based upon an intended loss of $14,533,000, which was the amount billed to Medicare during the defendant's tenure at Biscayne Milieu.  The PSI also recommends restitution in the amount $5,614,353.20, which reflects the amount paid by Medicare during the defendant's tenure there.

As explained below in Section II-A-2 of this submission (pages 8-17), all billings to Medicare during the defendant's tenure at Biscayne Milieu were fraudulent, and these facts either were known by the defendant or were reasonably foreseeable to him.  Accordingly, the PSI's loss recommendations are correct and should be upheld.

Under U.S.S.G. §2B1.1(b)(1), subject to certain exceptions not applicable here, the "loss" is the greater of the actual loss or intended loss.  *See* U.S.S.G. §2B1.1 application note 3(A) (2010 manual).  The Court need make only a reasonable estimate of the loss, as the loss caused by a fraud often may be difficult to determine with precise certainty.  *See United States v. Miller*, 188 F.3d 1312, 1316-17 (11th Cir. 1999); U.S.S.G. §2B1.1 application note 3(C) (2010 manual).

In health care fraud cases, proof of the amount fraudulently billed constitutes prima facie evidence of the intended loss.  *See United States v. Martinez*, 588 F.3d 301, 326-27 (6th Cir. 2009); *United States v. Mikos*, 539 F.3d 706, 714 (7th Cir. 2008); *United States v. Miller*, 316 F.3d 495, 501-05 (4th Cir. 2003); *but see United States v. Singh*, 390 F.3d 168, 193-94 (2d Cir. 2004).  This principle applies even when the amount billed substantially exceeds the amount paid.  *See United States v. Martinez*, 588 F.3d at 326-27 ($60,799,000 in bills submitted versus $12,337,230 for payments actually made to Martinez).  Although the defendant may rebut the prima facie showing with evidence demonstrating that he did not intend to cause the full extent of the loss reflected by the amount billed, *see United States v. Miller*, 316 F.3d at 505, the defendant has not presented any credible evidence here.  To the extent that the defendant relies upon his testimony at trial, the government submits that the defendant's testimony was not truthful and should be rejected.

The reason why courts look to the amount billed, rather than the amount actually paid, is that the rules for calculating loss look to the offenders' ***intent***, as opposed to their ***expectation***.  The

-6-

Court in *Miller,* 316 F.3d at 504, explained, "The justification for this rule is clear. As anyone who has received a bill well knows, the presumptive purpose of a bill is to notify the recipient of the amount to be paid." The Court continued:

> "[E]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can." *Geevers,* 226 F.3d at 193. While Miller, like the defendant in *Geevers,* "may not have expected to get it all, he could be presumed to have wanted to." *Id.* In such situations, a sentencing court may rely on the prosecution's prima facie showing as "sufficient evidence" that the face amount "was the intended loss." *Id.* at 194.

*Id.* at 505. *See also United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010) ("a criminal pays the price for the ambition of his acts, not their thoroughness").

The loss for which the defendant is accountable is not limited to group therapy notes that the defendant wrote or the patients for which Biscayne Milieu records identified him as the treating therapist. Rather, the Court should hold the defendant accountable for the reasonably foreseeable acts of others in furtherance of the conspiracy.

> Under the Guidelines, to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant. Once the court determines the scope of the defendant's involvement in the conspiracy, it then may consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity.

*United States v. Mateos*, 623 F.3d at 1370. For purposes of assessing the scope of the defendant's knowledge under the Sentencing Guidelines, deliberate ignorance counts equally as actual knowledge. *See United States v. Hristov*, 466 F.3d 949 (11th Cir. 2006).

2.      **The Entire Amount Billed to Medicare Was Fraudulent, and These Facts Were Known by the Defendant or Were Reasonably Foreseeable to Him**

The defendant challenges the factual basis supporting the loss recommendation.  His challenge fails.  For at least two reasons, the entire amount billed to Medicare was fraudulent.  First, the patients billed to Medicare were not eligible for PHP treatment.  Second, Biscayne Milieu operated as merely a patient mill and did not provide meaningful PHP treatment.  These facts were known by or reasonably foreseeable to the defendant, who is a highly educated and experienced mental health professional.  The defendant's knowledge of the fraud scheme's pervasive scope was supplemented by his knowledge of various other illegalities and improprieties at Biscayne Milieu.

a.      **The Patients Were Not Eligible for PHP Treatment**

The patients at Biscayne Milieu consisted of: (a) individuals from the Haitian/Creole-speaking community who were not mentally ill and rather attended Biscayne Milieu to receive false documentation to assist in procuring U.S. citizenship, (b) elderly individuals with Alzheimer's Disease and/or dementia, or (c) persistent substance abusers.  The defendant was aware that these individuals were not eligible, or those facts were reasonably foreseeable to him.

i.      Haitian/Creole-Speaking Patients: Under the Local Coverage Determination, Medicare PHP treatment is limited to acutely mentally ill individuals and is envisioned to operate as a "step up" when less intensive forms of treatment fall short.[2]  Notwithstanding these prerequisites, large numbers of the Haitian/Creole-speaking individuals admitted to Biscayne Milieu had no prior mental health history and were not mentally ill.  The defendant knew this and tried to block attempts by other Biscayne Milieu staff members to curb the practice.

---

[2]Gov. Exh. 1-g, at 5-6.

Once the defendant became Biscayne Milieu's clinical director, Manotte Bazile reported to him. When Bazile would tell the defendant that the Haitian/Creole-speaking patients who she was evaluating were not mentally ill, the defendant would ask, "[C]an you make him or her depressed?" Bazile added that although the defendant did not explain what he meant, she knew that his purpose was to get her to write something that could be used to justify their admission to Biscayne Milieu.[3]

Many of these patients told Bazile that they were there for what they described as the "citizenship program," which consisted being falsely certified as too mentally ill to take the civics portion of the U.S. citizenship test. Bazile complained to the defendant, who put her off, saying that he would take the matter up with Jorge Macli.[4] Many of the Haitian/Creole-speaking patients also admitted to Roselyn Nicole Charles that they had come to Biscayne Milieu for immigration benefits. Charles told the defendant, who also put her off, saying that he would bring the issue to the attention of recruiter Marie Dossous. Referring to Dossous, the defendant would add, "She can't say that."[5]

The defendant assigned Bazile and Madeline Lucas the task of completing the citizenship test exemption forms. Bazile and Lucas both tried to resist. The defendant backed off on Lucas, telling her that he understood her concerns. But the defendant prevailed on Bazile by "sweet talking" her.[6]

---

[3]Bazile Testimony of 7/30/2012, at 53-56. Bazile's testimony has been transcribed, and both parties have copies. However, the transcripts do not have docket numbers at this point.

[4]Bazile Testimony of 7/30/2012, at 55.

[5]DE 793:83-84 (Charles testimony of 7/17/2012).

[6]DE 763:79-82 (Lucas testimony of 7/25/2012); Bazile Testimony of 7/30/2012, at 85-87.

ii.   <u>Alzheimer's and Dementia Patients</u>: The LCD also limits PHP treatment to individuals cognitively able to participate and benefit from treatment.[7]  When Charles did intake, many patients recruited by James Edwards displayed obvious signs of Alzheimer's disease and dementia.  Some did not know their names or where they lived; others thought that they were at school or church.  Some gave "off the wall" responses to basic background questions.[8]

The defendant knew of the admission of the Alzheimer's and dementia patients and tried to deflect complaints about the practice.  In response to Charles' concerns, the defendant promised to interview the patients himself or to bring it up to Jorge Macli or Carmen Mercado or at staff meetings.  However, only a small number of these individuals were turned away.[9]

iii.   <u>Persistent Substance Abusers</u>: The LCD also excludes persistent substance abusers from PHP treatment.[10]  These individuals, however, constituted the overwhelming majority of the Biscayne Milieu patient population.  The recycling of the persistent substance abusers was particularly insidious.  Biscayne Milieu tried to conceal from Medicare its ongoing admission of substance abusers by minimizing and indeed eliminating the patients' substance abuse problems from the patients' diagnoses.  This aimed to assist Biscayne Milieu in evading Medicare audits but sadly set up the patients for failure.  Patients continued using drugs, oftentimes showing up high. They generally were not discharged until they relapsed, requiring their hospitalization, which merely set in motion their recycling back through Biscayne Milieu, often on multiple occasions.

---

[7]Gov. Exh. 1-g, at 6 & 9.

[8]DE 793:15-17 (Charles testimony of 7/17/2012).

[9]DE 793:83-85 (Charles testimony of 7/17/2012).

[10]Gov. Exh. 1-g, at 9.

While Biscayne Milieu's therapists may not have known the precise ins and outs of the LCD, they did know that the fact that their patients had a substance abuse background created a considerable conflict with Medicare guidelines. Indeed, Rufus Cargile explained that when patients would discuss their drug or alcohol addictions during group therapy sessions, some therapists would try to steer the discussion away from those topics, in order to avoid transgressing Medicare guidelines.[11] From these facts, it is reasonable to infer that the defendant understood that Biscayne Milieu was violating Medicare guidelines by admitting the substance abuse patients.

The defendant knew that patients were continuing to use illegal drugs and alcohol. Roselyn Nicole Charles told him when she would observe patients who were high or drunk and when patients would confide in her that they had recently used drugs or had an urge to use.[12] The defendant once again tried to dismiss or deflect Charles' observations. Other therapists similarly told the defendant about patients who were high.[13]

The defendant also was well aware that patients were frequently testing positive for illegal drugs or alcohol. The defendant was present at staff meetings when positive results would be discussed. Patients who tested positive generally were discharged, absent a relapse that required their hospitalization.[14] On cross examination, the defendant evasively attempted to minimize his

---

[11]DE 780:20-21 (Cargile testimony of 7/17/2012).

[12]DE 794:16-20 (Charles testimony of 7/18/2012).

[13]Bazile Testimony of 7/30/2012, at 100. *See also* DE 990:207-08 (Morales testimony of 7/23/2012) (explaining facts she observed leading her to conclude that patients had been recently using drugs)

[14]DE 38-39 (Morales testimony of 7/19/2012); Bazile Testimony of 7/30/2012, at 100; DE 763:50-51 (Lucas testimony of 7/25/2012).

knowledge of patients who he observed high while at Biscayne Milieu oscillating among different answers.[15]  The defendant's evasive and perjured testimony about this subject is addressed in more depth *infra*, at Section II-E-2-f of this submission (pages 30-31).  From this, the Court can readily conclude that the defendant frequently observed patients showing up high.

### b.       Biscayne Milieu Operated as a Patient Mill

The driving forces at Biscayne Milieu were attendance and billing, not treatment.  This was apparent from any number of perspectives.

Patients were steered to Biscayne Milieu by patient recruiters who trolled segments of the community that were rich with Medicare beneficiaries in furtherance of Biscayne Milieu's goal of maximizing the "census."  Through the lexicon of the fraud at Biscayne Milieu, patient recruiters came to be termed as "case managers."  Most of these purported "case managers," however, had absolutely no relevant training or experience.  As acknowledged by Jorge Macli in a conversation with Madeline Lucas, one of the main qualification of the "case managers" were their histories as drug addicts.[16]  One did not need to have the defendant's education or sophistication to know that Biscayne Milieu case managers were not mental health professionals in any sense whatsoever.

The defendant knew that some substance abusers were misled into attending.  Roselyn Nicole Charles told the defendant about patients who reported to her at admission that they had been told that Biscayne Milieu was a substance or alcohol abuse program.  As with Charles' other complaints, the defendant responded by putting her off.[17]

---

[15]DE 908:66-79 (Alalu testimony of 8/20/2012).

[16]DE 764:9 (Lucas testimony of 7/26/2012).

[17]DE 793:40-41 (Charles testimony of 7/17/2012).

Notwithstanding the directive that in the LCD that PHP treatment is meant to be individualized to the patient,[18] master treatment plans were copied and pasted from one to the next. Although psychiatrists were supposed to lead the treatment teams,[19] they did not participate in the formulation of the treatment plans and simply rubber-stamped the documents presented to them.[20] The defendant himself was complicit in this process. As the Court may recall, during cross-examination of the defendant the government introduced Exh. 232-b, which was a set of 11 master treatment plans that on which the defendant backdated his signature to make it appear that he signed them after consultation with other therapists. However, on the dates that the defendant claimed to have signed the documents, he actually was on vacation in Italy.[21]

Defendant Gary Kushner used patient "appointments" as a front during which he pencil whipped records to create the appearance of treatment. Clinical and clerical staff could readily observe that defendant Kushner spent exceedingly limited time with the patients,[22] and patients complained to Barbara Morales that defendant Kushner did not give them enough time.[23]

Patients were exploited in other ways. Some reported to therapist Barbara Morales that they essentially were coerced into attending. If they refused to attend, they would lose their housing and

---

[18]Gov. Exh. 1-g, at 5 and 21.

[19]Gov. Exh. 1-g, at 6, 19-21.

[20]DE 989:27-31 (Morales testimony of 7/19/2012).

[21]DE 908:102-11 (Alalu testimony of 8/20/2012).

[22]*See* DE 794:27 (Charles testimony of 7/18/2012); DE 994:80-81 (Mercado testimony of 8/7/2012); Bazile Testimony - 7/30/2012, at 105-06.

[23]DE 989:57-58 (Morales testimony of 7/19/2012).

become homeless.  Patients arrived appearing disheveled.  They complained of bed bugs, lack of

food, bad hygiene, insufficient numbers of beds, and not having control of their own money.  Some

patients would ask staff for food to take home.  Morales noticed at least one patient with visible

signs of bed bugs.[24]  Indeed, patients were so financially desperate that some could be convinced to

attend Saturday sessions through the incentive of pizza lunches or raffles for toiletry items.[25]  When

substance abusers relapsed, they were routinely recycled back to Biscayne Milieu, so that Biscayne

Milieu could continue to bill Medicare.

    While Morales's testimony did not address whether she directly conveyed such information

to the defendant, Madeline Lucas testified to conveying similar types of information to the defendant.

When Lucas overheard patient complaints about their living conditions – such as, fighting in houses,

safety concerns, or concerns about some patients using drugs – she brought those complaints to the

attention of the defendant, John Jackson, and/or Carmen Mercado.[26]  The Court also may recall Gov.

Exh. 11-c, which is the memo that the defendant requested from Madeline Lucas[27] that explained that

patient K.T. sought admission at Biscayne Milieu because he needed a place to live.

    It is reasonable to infer that the defendant also would have learned of the same patient

complaints simply by being present on the premises.  Lucas explained that she overheard the patient

---

[24]DE 989:49-50, 53-56 (Morales testimony of 7/19/2012); DE 990:206-08, 212 (Morales
testimony of 7/23/2012).

[25]DE 989:96-97 (Morales testimony of 7/19/2012); DE 996:160 (Mercado testimony of
8/9/2012).

[26]DE 763:54-56 (Lucas testimony of 7/25/2012).

[27]DE 765:39-40 (Lucas testimony of 7/30/2012).

complaints from her cubicle.  Biscayne Milieu's clinical space was tight, and the walls were thin.
Patient conversations in group therapy rooms or the cafeteria could be overheard by those nearby.[28]

From these different sources of information, the defendant would have known that Biscayne
Milieu was operating as a patient mill rather than as a facility that treated patients.  As noted above,
the defendant furthered this goal  through the various steps that he took to quell or deflect the staff
complaints that tried to reign in some of the more egregious components of the fraud scheme.

        c.      **Evidence of Other Instances of Dishonesty, Illegalities, and Improprieties at Biscayne Milieu Supplemented the Defendant's Knowledge of the Scope of the Fraud at Biscayne Milieu**

        i.     <u>Fraudulent Billing for Group Therapy Sessions</u>:  Numerous witnesses testified to the
chronic situation of group therapy sessions starting late and ending early.[29]  This situation continued
well through the defendant's tenure as clinical director.  The government introduced Exhibit 175-c,
which was a memorandum dated May 6, 2011, from Ron Brenesky to all therapists.  In pertinent
part, the memorandum stated:

> Please be advised that you must be in the room to begin your group at
> 9:30.  You must start on time even if the patients are just arriving or
> not present. No therapist that has a group should be outside of their
> rooms during the  designated time to start and end.  Administration
> will not tolerate this rule to be overlooked.

This memorandum was circulated while the defendant was the clinical director.  Roselyn
Nicole Charles testified to delivering it to all therapists.[30]

---

[28]DE 763:53-54 (Lucas testimony of 7/25/2012); *see also* Gov. Exh. 84-a (photographs of
interior of Biscayne Milieu clinical facilities).

[29]DE 793:93-97 (Charles testimony of 7/17/2012); DE 763:84-86 (Lucas testimony of
7/25/2012); DE 995:43-46 (Mercado testimony of 8/8/2012).

[30]DE 793:101-02 (Charles testimony of 7/17/2012).

ii.     Fraudulent Billing for Holidays: Witnesses also testified to Biscayne Milieu billing Medicare for therapy purportedly conducted on major federal holidays, when in fact patients were taken for picnics at local parks.[31]  Although the government's witnesses did not testify to discussing this practice specifically with the defendant, given the length of the defendant's tenure at Biscayne Milieu as well as his position, the rational inference is that he would have known about it.

iii.    Falsification of Records:  The defendant not only falsified scores of records on his own, he was aware that this was the standard practice at Biscayne Milieu to cover up for its fraudulent billing.  When Jacqueline Moran billed for patients who were not present, the defendant was one of the people who procured after-the-fact group therapy notes, or sometimes wrote them himself.[32]  The defendant tried to enlist Madeline Lucas to write an individual therapy note for a patient who she did not see – patient B.H., who was associated with Count 4 – by offering to provide her John Jackson's electronic password.[33]  As noted above, the defendant encouraged Manotte Bazile to falsify records for Haitian/Creole-speaking patients by having them appear depressed, when they were not.  The defendant knew that therapist Debra De Jesus created phony after-the-fact records in response to a Medicare audit of patient files for T.W.[34]  The defendant openly joked with De Jesus about "doing it the Cuban way," which was their shorthand for falsifying records.[35]

---

[31]DE 793:89-93 (Charles testimony of 7/17/2012); DE 989:97-103 (Morales testimony of 7/19/2012).  *See also* Gov. Exh. 78-b (billing data for July 4, 2009).

[32]DE 793:112 (Charles testimony of 7/17/2012) DE 995:49, 69 (Mercado testimony of 8/8/2012).

[33]DE 763:165-67 (Lucas testimony of 7/25/2012).

[34]DE 793:108 (Charles testimony of 7/17.2012).

[35]Bazile Testimony of 7/30/2012, at 90-91.

iv.  <u>Patients "Doing Licks" and Being Paid to Attend</u>:  According to Roselyn Nicole Charles, patients openly discussed "doing licks" – in group therapy, in the cafeteria, and in the bus area.[36]  Charles also knew of patients who received kickbacks to attend Biscayne Milieu.  Asked if she told the defendant about patients getting paid to attend, Charles responded, "All the time."[37]

### 3.  The Defendant's Remaining Arguments to the Contrary Lack Merit

i.  <u>Loss Figures Attributed to Manotte Bazile and Jacqueline Moran</u>: In trying to latch on to the lesser loss figures attributed to clinical social worker Manotte Bazile and billing clerk Jacqueline Moran, the defendant overlooks that almost all of the therapists who the Court has sentenced – Thomas Hamer, Madeline Lucas, Deborah De Jesus, and Barbara Morales – have been held accountable for the entire amount billed.  The only exception is Gala Myriam Onofre, who was held accountable for greater than $7 million, but not more than $20 million, when the amount billed during her tenure was $25 million (DE 959).

With respect to Bazile, her work focused on the Haitian/Creole-speaking patients.  The $3.2 million loss amount attributed to her was the amount billed for those patients and was an agreed-upon figure negotiated as part of a plea agreement.  For these reasons, Bazile's loss calculation is not relevant to the amount for which the defendant should be held accountable.

With respect to Moran, she held a very low-level job at Biscayne Milieu.  The Court characterized her as Biscayne Milieu's "receptionist." She certainly had none of the specialized education, experience, or insight in the mental health field that this defendant possesses.  The loss

---

[36]DE 793:53-54 (Charles testimony of 7/17.2012); *see also* DE 779:20-22 (Cargile testimony of 7/16/2012) (patients "sometimes" discussed doing licks while in group therapy and "sometimes . . . tried to go underground with it" to avoid alerting the therapists).

[37]DE 793:82 (Charles testimony of 7/17/2012).

amount attributed to her was a product of her limited role in the scheme (DE 1100:1-5). Indeed, the Court's determination that she merited a minor role reduction for the discrete loss amount for which she was held accountable illustrates her limited role in the scheme. This defendant is in no way comparable to her.

       ii.    <u>Claim That Defendant Provided "Real Therapy to Real Patients"</u>: This contention is a subset of the defendant's mertiless contention that he was guilty of nothing more than sloppy record-keeping. The defendant provides no support from the record for his claim that he provided legitimate therapy, other than his own testimony, which of course was perjured in many respects. Moreover, whatever therapy the defendant may have provided does not absolve him of his complicity. The defendant knew that the patients were ineligible, that they were not receiving the treatment required by Medicare, and that Biscayne Milieu was a Medicare fraud mill. From this, the defendant knew that any therapy services that he provided were not reimbursable by Medicare, that the notes he wrote were designed to perpetrate the fraud that they were reimbursable, and that the money that Biscayne Milieu paid him came from the proceeds of a pervasive fraud scheme.

       iii.    <u>Claimed Reliance on Physicians</u>: The Court should reject the defendant's attempt to take sanctuary in the admission decisions made by Biscayne Milieu physicians. As explained *supra*, at Section II-A-2-b of this submission (page 13), it was well-known within Biscayne Milieu that defendant Gary Kushner was not treating patients and that patients were chronically recycled. Because the defendant necessarily understood that the psychiatrists played a central role in Biscayne Milieu's operation as a Medicare fraud mill, his attempts to separate himself from the conduct of the psychiatrists fails. For the same reasons, his reliance upon *United States v. Medina*, 485 F.3d 1291, 1299 (11th Cir. 2007), also fails.

iv.     Attempt to Minimize Facts Well-Known Within Biscayne Milieu as "Office Chatter":
The defendant contends that the Court cannot rely upon the observations of Biscayne Milieu staff
to find that Biscayne Milieu patients did not qualify for PHP treatment.  According to the defendant,
the Court cannot make such findings absent expert medical testimony.  This claim is baseless.

It does not take an expert to know that people who attended Biscayne Milieu for its
"citizenship program" did not need PHP treatment.  Nor does it take an expert to understand that
elderly individuals who were too confused to know their names were not going to benefit from PHP
treatment.  An expert is not needed to see that patients' substance abuse problems were being
excluded from their diagnoses.  Nor is an expert needed to realize that patients were showing up
high, were testing positive, were being chronically recycled, and were not getting better.

The defendant's insistence upon expert testimony as a prerequisite to a finding of fraud is
best understood as an attempt to shield himself in the scheme's sophistication.  The Court should
reject the defendant's attempt to feign ignorance of the fraud that others readily observed.  As noted
earlier, in assessing the defendant's knowledge under the Sentencing Guidelines deliberate ignorance
counts equally as actual knowledge.  *See United States v. Hristov*, 466 F.3d 949 (11th Cir. 2006).

v.     Relevance of Defendant's Acquittal on Count 11: The defendant contends that his
acquittal on Count 11 is inconsistent with the conclusion that he knowingly participated in a
pervasive fraud scheme.  The defendant's contention is without merit.

The government's evidence with respect to Count 11 was that patient K.T. told Madeline
Lucas that he went to Biscayne Milieu in order to secure housing and that K.T. was admitted even
though he had no signs of mental illness.  Although the government showed that Lucas had written
a memo in which she reported these facts to the defendant, the defendant argued that he had no

authority to deny admission to K.T., and the government was unable to show that he had any such authority.  The jury's verdict acquitting the defendant on Count 11 reflects only that the defendant did not play a role in K.T.'s admission.  The verdict does not show that the jury disbelieved Lucas or that it concluded that K.T.'s admission was proper or legitimate.  The defendant's claim that the jury rejected Lucas's testimony as to Count 11 (DE 1114:16) overlooks that the jury convicted both Sandra Huarte and Biscayne Milieu on Count 11 (DE 847 & 854).

## B.   §2F1.1(b)(9)(C) – SOPHISTICATED MEANS

The Court should deny the defendant's objection to the two-level specific offense characteristic under §2B1.1(b)(9)(C), which applies to offenses that involve "sophisticated means."

The relevant application note explains: "For purposes of subsection (b)(9)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. §2B1.1 note 8(B) (2010 manual).  "There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated." *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).  "The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense. Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009) (internal citations, quotations, and brackets omitted).

Falsifying medical examination results signifies sophisticated means. *See id.* at 751-52.  Use of fraudulent invoices also can be a sign of sophisticated means. *See United States v. Shepard*, 154

Fed. Appx. 849, 852 (11th Cir. 2005); *United States v. Miell*, 744 F. Supp.2d 904, 940-41 (N.D. Iowa 2010), *aff'd* 661 F.3d 995 (8th Cir. 2011), *cert. denied*, 132 S.Ct. 1777 (2012); *United States v. Rubashkin*, 718 F. Supp.2d 953, 976 (N.D. Iowa 2010).

The defendant merits the recommended specific offense characteristic. The fraud scheme in this case was built on phony medical records. These included records of purported psychiatric and psychological examinations that falsely attributed acute mental disorders to Medicare beneficiaries who were not so afflicted, as well as minimizing substance abuse disorders suffered by individuals who were persistent abusers. The phony medical records of course also included countless group therapy notes that were copied and pasted from one on to the other and otherwise wholly falsified.

The defendant not only knew of this conduct, but he also activity participated in it. As noted above, the defendant falsified scores of records to cover-up the fraudulent activities. He also encouraged other clinical staff working at his direction to similarly falsify records. He even joked with Debra De Jesus about their practice of falsifying records. This was done to conceal the fraud by sanitizing Biscayne Milieu's records in advance of possible Medicare audits.

## C.   **§3B1.1(b) – AGGRAVATING ROLE ADJUSTMENT**

Section 3B1.1(b) of the Sentencing Guidelines and application note 2 provides for a three-level upward adjustment when a defendant manages or supervises at least one other participant, and the criminal activity was "otherwise extensive." Based upon the facts set forth at trial the defendant meets the criteria for a three-level upward adjustment.

As clinical director, the defendant assigned work to the other therapists and clinical staff at Biscayne Milieu. This is reflected in the defendant's role in assigning the completion of the

citizenship test exemption forms to Manotte Bazile and Madeline Lucas.  The defendant's managerial role is further reflected in the fact that Jorge Macli assigned him to oversee Madeline Lucas's audit of patent records following the arrests at ATC.[38]

That said, the government understands that the facts supporting this adjustment are not as compelling as those that support the other adjustments or specific offense characteristics that the government is seeking for this defendant.  Accordingly, the government will yield to the defendant's objection to the recommended aggravating role adjustment.  However, the government submits that the defendant's role at Biscayne Milieu in supervising other participants and in promoting the offense conduct is relevant to the balance of §3353(a) factors.

### D.   §3B1.2(b) – MITIGATING ROLE ADJUSTMENT

The reasons that would support an aggravating role adjustment for this defendant call for denying his request for a mitigating role adjustment.  The defendant's conduct in promoting the fraud scheme by turning back staff complaints lends further support to the grounds for denying the downward adjustment.  Moreover, unlike the other therapists at Biscayne Milieu, the defendant frequently met with Sandra Huarte, which is a mark of his significant level of responsibility there.[39]

In seeking a downward reduction for minor role, the defendant claims that Biscayne Milieu nurse Carmen Mercado "was responsible for overseeing the clinical aspects of BMI's operations" (DE 1114:21).  The defendant's argument inflates her role at Biscayne Milieu and in the conspiracy and minimizes the defendant's role.

---

[38]DE 765:49-50 (Lucas testimony of 7/30/2012).

[39]DE 995:38 (Mercado testimony of 8/8/2012).

The defendant also tries to analogize himself to the other therapists who received minor role adjustments, such as Thomas Hamer.  However, the better comparison is to the defendant's predecessor as clinical director, John Jackson.  In his plea agreement, Jackson agreed to a three-level upward reduction for aggravating role.[40]  The government recognizes that Jackson had more involvement than the defendant in promoting the Biscayne Milieu fraud scheme.  In addition to assisting in the rampant falsification of records, Jackson also served as a paid patient recruiter and brought Sabrina Pressley and Rufus Cargile into the scheme.  While the government is not seeking an upward role adjustment for this defendant, the defendant's role as clinical director provides more than sufficient grounds for denying the defendant's request for a downward role adjustment.

## E.   §3C1.1 – ADJUSTMENT FOR OBSTRUCTION OF JUSTICE

### 1.   General Principles

The defendant merits a two-level upward adjustment for obstruction of justice under U.S.S.G. §3C1.1 for his perjury at trial.  For purposes of §3C1.1, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Four elements are required to support a perjury finding under §3C1.1.

> (1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.

---

[40]DE 10:6 in Case No. 11-20617-Cr-Ungaro.

*United States v. Singh*, 291 F.3d 756, 763 & n.4 (11th Cir. 2002).  The defendant does not appear to contest that his testimony was under oath and was material.  He only appears to maintain that his testimony was truthful or, alternatively, was not willfully false.

Case law directs the Court to make an independent factual finding that the defendant gave perjured testimony on a material matter in order to apply the obstruction of justice adjustment.  While "[i]t is preferable that the district court make specific findings as to each instance of obstruction by identifying the materially false statements individually," *id*. (internal citation omitted), it is sufficient "that the district court makes a general finding of obstruction of justice that encompasses all of the factual predicates of perjury," *id*. (internal quotation and citation omitted).

The defendant contends that the proposed upward adjustment for obstruction of justice penalizes him for exercising his right to testify.  The defendant's contention fails.  While the defendant has the right to testify, he does not have the right to commit perjury.  Accordingly, case law affirms that enhancing a defendant's sentence under §3C1.1 based upon the defendant's commission of perjury at trial does not interfere with the defendant's right to testify.  *See United States v. Dunnigan*, 507 U.S. at 96.

In objecting to the recommended adjustment, at pages 28-32 of his submission the defendant complains that the government did not seek an obstruction adjustment either for his co-defendants who lied to agents before pleading guilty or for Thomas Hamer, whose candor the government questioned.  The defendant's complaints are irrelevant to the issue before the Court.  To obtain an obstruction of justice adjustment for defendants who lie to agents, the government must  show that their false statements significantly impeded the government's investigation or prosecution.  *See* U.S.S.G. §3C1.1 application notes 4(G) & 5(B) (2010 manual).  The government elected not to try

to make such a showing, and the government's decision in that regard does not create a safe harbor for the defendant's perjury.  Although the defendant claims that the government exercised undue leniency as to Hamer, the government did object to Hamer receiving credit for acceptance of responsibility (DE 561).  The fact that the Court ultimately disagreed with the government's position with respect to Hamer is similarly irrelevant.

> **2.     The Defendant's Perjured Testimony**

The defendant's testimony at trial has been transcribed and is docketed as DE 908.  The government submits that the defendant perjured himself as to six separate subjects.  Each subject is identified below.  Attached to this submission are excerpts of the relevant portions of the transcript containing the defendant's perjured testimony.  The excerpts are identified as Transcript Excerpts 1-a,1-b, 2-a, 2-b, 3-a thru 3-e, 4, 5, and 6.  Within each transcript excerpt, the defendant's specific perjured testimony is highlighted.

At pages 22-28 of his submission, the defendant launches an array of arguments that attempt to rationalize the jury's verdict with his claim that he testified truthfully.  His arguments fail.  The subject-by-subject discussion below clearly outlines the grounds for the unavoidable conclusion that the defendant repeatedly and willfully perjured himself.

> **a.     Defendant's Testimony Regarding Count 3**
> **(Transcript Excerpts 1-a and 1-b)**

Count 3 charged the defendant with health care fraud in connection with the billing for patient C.S. for group therapy services purportedly rendered during the morning session of February 2, 2010. The government called Daniel Nicgorski, who is a nurse at a local dialysis center.  Mr. Nicgorski identified a record from the center (Gov. Exh. 3-d) that established that C.S. actually was

receiving dialysis that morning.   The defendant wrote group therapy notes for C.S. for the last two groups of the morning session on February 2nd (Gov. Exhs. 3-c), even though C.S. was not actually present at either group.

On direct examination at pages 10-12 (Transcript Excerpt 1-a) and on cross-examination at page 48 (Transcript Excerpt 1-b), the defendant admitted writing the notes but denied knowing that C.S. was absent from the sessions.   Rather, the defendant testified that notes were accidental mistakes.   The defendant testified that February 2nd was his first day working at Biscayne Milieu, that he was mistaken as to C.S.'s identity, and that the notes he wrote for C.S. were intended for another patient who he thought was C.S.

The jury convicted the defendant on Count 3.   The jury could not have done so without finding that the defendant's testimony as to Count 3 was false.   Along these lines, the government notes that Barbara Morales testified that when C.S. left group therapy early to go for dialysis treatment, she wrote notes as if he had been in attendance for the full session.[41]   Morales's testimony supports the conclusion it was a standard practice at Biscayne Milieu to bill for C.S. when he was not in attendance.   *See United States v. Ekpo*, 266 Fed. Appx. 830, *5 (11th Cir. 2008) (evidence that defendant perjured himself supported an obstruction of justice sentence enhancement in a prosecution for health care fraud; defendant's testimony concerning his knowledge of fraudulent Medicare claims for wheelchairs and accessories was irreconcilable with the jury verdict, and was directly contradicted by statements of a witness).

---

[41]DE 989:80-81 (Morales testimony of 7/19/2012).

**b.** **Defendant's Testimony Regarding Count 4**
**(Transcript Excerpts 2-a and 2-b)**

Count 4 charged the defendant with health care fraud in connection with the billing for patient B.H. for individual therapy services purportedly rendered on April 19, 2010. Madeline Lucas testified that months after the service was billed to Medicare, the defendant asked her to write a individual therapy note for the session. Lucas told the defendant that she had not seen B.H. and accordingly declined to do the note. The defendant then offered to provide Lucas with the computer password for John Jackson, who was no longer employed at Biscayne Milieu by that time. Under the defendant's proposal, Lucas could write the note and then use Jackson's electronic signature to make it appear that Jackson had written it. Lucas declined. Later that day, the defendant told Lucas that the matter had been taken care of.[42]

Biscayne Milieu's electronic database contained an individual therapy note for B.H. for April 19, 2010, purportedly written and signed by Jackson (Gov. Exh. 4-b). However, a print-out from Biscayne Milieu's electronic database reflected that note actually had been written on November 3, 2010 (Gov. Exh. 4-c), approximately four months after Jackson left Biscayne Milieu and over six months after the service purportedly had been rendered.

On direct examination at pages 22-23 (Transcript Excerpt 2-a) and on cross-examination at pages 54-59 (Transcript Excerpt 2-b) , the defendant admitted that he spoke to Lucas after receiving a list of overdue notes reflecting that Lucas was responsible for the note for B.H. The defendant also admitted that he asked Lucas to write the B.H. note. However, the defendant testified that after Lucas told him that she had not seen Hoffman, he told her that she did not need to do the note. The

---

[42]DE 763:165-67 (Lucas testimony of 7/25/2012).

defendant further claimed: (a) that after following his conversation with Lucas, he returned the list to the management office with a note indicating that Lucas had advised that she had not seen B.H.; (b) that, after doing so, he had no further involvement in the matter; and (c) that he had no involvement in the creation of the false note.

The jury convicted the defendant on Count 4.  The jury could not have done so without finding that the defendant's testimony as to Count 4 was false.  Along these lines, the government notes that the defendant's claim that he let the matter drop after Lucas declined to do the note does not square with common sense.  As the defendant admitted on cross-examination at page 56-57, his responsibilities included collecting missing and overdue notes.  It strains reality to believe that he would have let the matter drop after Lucas declined to do the note.  The fact that the note was completed under Jackson's name tends to confirm that the defendant did not let the matter drop – as the jury so found.  *See id.*

### 3.   Defendant's Testimony Regarding Claimed Accuracy of Group Therapy Notes   (Transcript Excerpts 3-a through 3-e)

As the Court recalls, at trial the government tendered approximately 87 sets that contained two or more group therapy notes that the defendant copied and pasted (Exhs. 142-a thru 145-i).  The government also tendered a set of notes for seven patients on one date (Exh. 230) and showed how about five weeks later the defendant copied and pasted the information from those notes into notes for seven other patients (Exh. 231).

On direct examination at pages 16-19 (Transcript Excerpt 3-a), the defendant claimed that the similarities in the copied and pasted notes resulted from his practice of writing quotations on a board at the start of each session that the patients subsequently adopted.  On cross-examination at

pages 123-24 (Transcript Excerpt 3-b) and on re-direct examination at pages 158, 160-61, and 173-74 (Transcript Excerpts 3-c through 3-e), the defendant claimed that all of his notes and the purported quotations contained in the notes were accurate.

The defendant's claim that the notes were accurate is mathematically improbable to the point of being preposterous. The Court should find the testimony to be perjured.

### d. Defendant's Testimony Regarding Knowledge of Patients Attending for Immigration Purposes (Transcript Excerpt 4)

On direct examination at page 14 (Transcript Excerpt 4), the defendant was asked if he was "personally aware of any Haitian patient who came just for Immigration papers." The defendant responded, "No, sir."

The defendant's testimony was directly contradicted by Roselyn Nicole Charles, who testified that she told the defendant about patients who reported to her that "'I am here for Immigration.'"[43] Manotte Bazile similarly testified that she told the defendant about Haitian patients who were there for immigration reasons and that the defendant responded by asking her if she could make the patients appear depressed.[44] For these reasons, the government submits that the defendant's testimony referenced in the previous paragraph was perjured.

### e. Defendant's Testimony Denying Telling Manotte Bazile to Make Haitian/Creole-Speaking Patients Appear Depressed (Transcript Excerpt 5)

On direct examination at page 15 (Transcript Excerpt 5), the defendant was asked if he ever told Manotte Bazile to make patients appear depressed. He responded, "No, sir."

---

[43]DE 793:83-84 (Charles testimony of 7/17/2012)

[44]Bazile Testimony of 7/30/2012, at 54-56.

As noted in the previous subsection, the defendant's testimony was directly contrary to Bazile's testimony on this point.  The government submits that the defendant's testimony was perjured.

> **f.**       **Defendant's Testimony Regarding Knowledge of Patients Arriving High at the Facility (Transcript Excerpt 6)**

Cross-examination at pages 66-79 (Transcript Excerpt 6) contained a lengthy colloquy in which the defendant attempted to minimize his knowledge of patients who arrived high at Biscayne Milieu.  Over the course of the colloquy, the defendant grudgingly gave ground on a few occasions. At page 79, however, the defendant refused to commit  to acknowledging while at Biscayne Milieu to knowing that at least between 14 or 15 patients had arrived at the start of the day high.

By way of background, on cross-examination at page 67 the defendant admitted that he observed patients arriving high "[o]n at least a couple of occasions."  Later on the same page, the defendant admitted, "There were definitely occasions."  At page 68, in response to the question, "Were there many occasions," the defendant claimed, "I can't give you a number."  At page 70, in response to similar questioning, the defendant next said, "Let's say a few occasions."

Towards the bottom of page 70, the defendant then said, "It could have been 10."  At the bottom of page 71 and carrying over to page 72, the defendant explained that the estimate of "10" included the patients who he personally observed high, plus the patients who other therapists reported to him that they observed were high.

> It could have happened ten times because -- I think when you were asking me initially, I was more focused on when you said about breakfast and people coming in, but then I am also remembering what about if a therapist came to me and said, hey, I have got someone in my group, I need you to evaluate them.  I would go and at least remove the patient and take them to nursing so they could be evaluated.

In response to further questioning starting at the bottom of page 78 and continuing over to page 79, the defendant claimed that he could not say whether the number was "20," 50," or "100."

At the top of page 79, the defendant described the figure of between "2 and 10" as a "guestimate." After admitting that it could been "11 or 12," the defendant was asked, "Then, when you say that sure it could be 11 or 12, are you telling me there is no way it could be 14 or 15?" The defendant responded:

> Sir, I don't know what to say except that I can't even give you a best guesstimate. Like if you would ask me what percentage do I think of the people were dual diagnosed, I can give you an estimate, but I can't tell you how many people came in high or intoxicated, just like I can't tell you how many people had positive tox screens when they were discussed at clinical meetings. It wouldn't be fair or accurate.

Following that response, at the middle of page 79 the defendant was asked, "And the reason why you can't tell us how many patients came in high was because there were so many that you can't count them, correct?" He responded, "I can't -- I can't say that."

The government submits that the Court should find that the defendant perjured himself by claiming at page 79 that he could not commit to knowing that at least 14 or 15 patients came in high. At page 72, the defendant admitted that he could not recall the name of any specific patient who arrived at the facility high. This indicates that patients showed up high with sufficient regularity that there was not a specific patient who made a firm impression on the defendant's mind. The Court also should conclude that the defendant's generally evasive testimony on this subject itself exhibited the was willfully perjuring himself.

### III.  **CONCLUSION**

Many of the grounds supporting the government's requested sentence of 121 months imprisonment are expressed earlier in this response.  By way of summary, the criminal conduct that the defendant committed, Medicare fraud, is undeniably serious.  The defendant knew that Biscayne Milieu was permeated with fraud, and he embraced its criminal goals from almost the moment he started working there.  He falsified scores of records.  When John Jackson became too much of a liability, the Macli family turned to this defendant to run the clinical side of the conspiracy, where the defendant promoted the fraudulent conduct by his subordinates and parried staff complaints that sought to reign in some of Biscayne Milieu's more egregious practices.  As part of his role in promoting the fraud scheme, the defendant tried to defraud a second governmental agency, abetting immigration fraud by enlisting his subordinates to complete the forms that falsely certified that the Haitian/Creole-speaking patients were too mentally ill to take the civics portion of the citizenship test.  These considerations suffice to justify the sentence that the government seeks – particularly, when coupled with the defendant's failure to accept responsibility for his conduct.  *See United States v. Mateos*, 623 F.3d 1350, 1367 (11th Cir. 2010) (lack of remorse of defendant who went to trial and continued to protest innocence valid consideration to take into account at sentencing), *cert. denied,* 131 S. Ct. 1540 (2011).  The defendant's repeated perjury lends substantial added force to the grounds supporting the government's requested sentence.  *See id*. (recognizing perjured testimony as a consideration that can justify variance above advisory guidelines).

The defendant contends that the advisory guidelines overstate the seriousness of his conduct.  The considerations identified in the previous paragraph and outlined in more depth throughout this submission suffice to defeat that argument.  Along these lines, the government notes that it is not

seeking upward adjustments for aggravating role under §3B1.1(b) or special skill under §3B1.3, even though the facts support such an adjustment.[45]

The Court also should reject the defendant's attempt to analogize himself to Thomas Hamer, who received a relatively lenient sentence after pleading guilty. What the defendant describes as the "drama" at Hamer's sentence (DE 1114:41) is better understood as Hamer having difficulty refraining from talking before thinking. This defendant held a higher level of responsibility at Biscayne Milieu than Hamer did. He persists in denying his guilt, and he perjured himself.

The defendant now stands for sentencing following a trial in which the Court received the evidence of this defendant's important role in an insidious Medicare fraud scheme. The government respectfully submits that the Court should find the defendant's offense level to equal a level 30 and should sentence him at the top end of the advisory guidelines, or 121 months imprisonment.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:   /s/ Michael S. Davis
MICHAEL S. DAVIS
ASSISTANT U.S. ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027; (305) 530-6168 (FAX)
e-mail: Michael.Davis2@usdoj.gov

---

[45] Under §3B1.3, the Court could impose one of these adjustments, but not both. As the Court may recall, because the government failed to seek an abuse of trust or special skill adjustment for Thomas Hamer, the government has not sought these adjustments for any other clinical staff members.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that I electronically filed a copy of this document with the Clerk using CM/ECF.

/s/ Michael S. Davis
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY